Dr. Milton MARGOLES, Plaintiff,

v.

WISCONSIN STATE BOARD OF MEDICAL EXAMINERS, Doctor F. A. Ross, Doctor Thomas E. Henney, Doctor Robert G. Zach, Doctor G. Stanley Custer, Doctor John J. Satory, Doctor David J. Twohig, Doctor H. G. Withrow, Doctor Benjamin Lawton, and Doctor Thomas W. Tormey, Jr., Individually and as members of the Wisconsin State Board of Medical Examiners, Leroy L. Dalton, Individually as counsel to the Wisconsin State Board of Medical Examiners, and Donald Pressentin, Individually and as investigator for the Wisconsin State Board of Medical Examiners, Defendants.

No. 70–C–151.

United States District Court, W. D. Wisconsin.

Feb. 23, 1978.

---

Daniel Walker, Walker, Gende, Hatcher, Berz & Giamanco, Chicago, Ill., for plaintiff.

Charles R. Larsen, Asst. Atty. Gen., Madison, Wis., for defendants.

## DECISION AND ORDER ON SECOND MOTION FOR SUMMARY JUDGMENT

ROBERT D. MORGAN, Chief Judge.

As developed and argued to date, plaintiff's complaint seeks money damages, in what amount to four counts, for alleged violation of his civil rights by defamation and denial of due process of law, and for alleged common law slander. Jurisdiction of the civil rights causes of action was laid under 28 U.S.C. §§ 1331 and 1343(3) and 42 U.S.C. §§ 1983 and 1985, and the slander cause of action rests on diversity of citizenship under 28 U.S.C. § 1332, as well.

Through a detailed Opinion and Order filed herein on July 25, 1975 (67 F.R.D. 666), this court allowed motions for summary judgment in favor of all defendants on the conspiracy count (Second Cause of Action, § 1985) and on the due process count (Fourth Cause), and allowed such motions in favor of nine defendants on the so-called First Cause of Action; but denied summary judgment to defendants Dalton and Tormey on that count, and to defendant Ross on the slander count (Third Cause).

Subsequently, after scheduled trial had been delayed at plaintiff's request, the remaining defendants filed a second motion for summary judgment, which has been dealt with in a Report and Recommendation and an Amendment to Report and Recommendation issued to the parties and to this judge, after briefing and argument before her, by United States Magistrate Barbara B. Crabb. The court hereby adopts the conclusion of said magistrate that filing and consideration of the second motion for summary judgment is appropriate.

Since the 1975 decision herein, the United States Court of Appeals for the

Seventh Circuit has decided *Beard v. Robinson,* 563 F.2d 331 (7th Cir. 1977), which clearly holds that the applicable state statute of limitations in a federal civil rights (§ 1983) case is the limitation on "all civil actions not otherwise provided for," rather than the limitation governing the closest analogous state tort action. Because this court in its earlier decision on the first cause of action applied the two-year Wisconsin libel and slander limitation, and because *Beard* requires the six-year Wisconsin limitation applicable to an action "when a different limitation is not prescribed by law," review of the prior decision is required to determine the extent to which application of the shorter statute of limitations may have contributed to the orders previously entered.[1] That such orders are still subject to any necessary correction in this court now is clear under Rule 54(b), Federal Rules of Civil Procedure, because there was no express direction for the entry of any judgment in the Opinion and Order of July 25, 1975. Accordingly, the period involved on Count I reaches back to June 11, 1964, rather than to June 11, 1968, as heretofore held.

In responding to this second motion by defendants for summary judgment, having changed counsel at least a second time, plaintiff now asserts that the "findings and opinion" in the 1975 Opinion and Order "are, unfortunately, confusing and in some respects contradictory." He also claims error in some of the facts there stated to be uncontroverted. To the extent that these comments may be valid, relief should be provided.

It was not the court's intention in 1975 to make "findings," in the sense that it decided issues of fact, whether material or not; but, in keeping with the letter and spirit of Rule 56(e), F.R.Civ.P., it was attempting to state a factual background on which no substantial dispute appeared to exist in the very substantial record of briefs, affidavits, and discovery materials, much of which is conclusory allegation, or opinion, or argu-

ment, and some of which is competent and relevant sworn testimony.

There is no value here in disputation over semantics or over immaterial matters. Care was taken in gleaning the "Uncontroverted Facts" in 1975, and the court is not willing to abandon those now on any unspecified basis. It is perfectly clear, of course, that the court did then find, and state, triable issues with respect to defendants Tormey and Dalton on the first cause of action, and with respect to defendant Ross on the third.

As ordered in 1975, and in keeping with the mandate of the last sentence of Rule 56(d), F.R.Civ.P., the "Uncontroverted Facts" are to be deemed essentially established at any necessary trial herein; but that need not preclude proof of any relevant contacts by defendant Dalton with persons in states other than Michigan, if, in fact, there were such. No other supposed inaccuracies in the "Uncontroverted Facts" are perceived.

It is also urged that the 1975 ruling granting defendants summary judgment on the fourth count, through application of the doctrine of *res judicata,* should be reconsidered and reversed. The court is not willing to do that, in the firm belief that the conclusion reached in 1975 is sound and that to reverse it would be error.

### THE QUESTION OF IMMUNITY

The defendants' motion now under consideration rests heavily on the doctrine of immunity of public officials to civil damage suits. While that doctrine was advanced and argued on the prior motion in 1975, the point was not addressed by this court in any way in its Opinion and Order. It can only be supposed that it was overlooked in the number and complexity of the decisions there taken. In any event, there could be no justification for not passing upon it now. Judicial oversight, like application of the wrong statute of limitations, is surely subject to correction before a judgment has become final.

---

1. The two-year Wisconsin statute of limitations on libel and slander actions is still applicable to

the common law slander action against defendant Ross.

There is no dispute over the facts that, at times here pertinent, defendant Ross was President and a member of the Wisconsin State Board of Medical Examiners; defendant Tormey was a member and Executive Secretary of that Board; and defendant Dalton was an Assistant Attorney General of the State of Wisconsin, assigned as legal counsel to the Board.[2] All are sued "individually and as members of [or counsel to or investigator for] the Wisconsin Board of Medical Examiners," and the allegations against them charge things done or said in their respective official capacities.

## THE TEST FOR OFFICIAL IMMUNITY

An immunity of public officials to civil damage suits is ancient in the common law. In holding a judge exempt from liability in a civil action for acts done in the exercise of his official function, the Supreme Court, in 1871, speaking through Mr. Justice Field, said:

"This was adjudged in the case of *Floyd and Barker,* reported by Coke, in 1608 [12 Coke 25], where it was laid down that the judges of the realm could not be drawn in question for any supposed corruption impeaching the verity of their records, except before the king himself, and it was observed that if they were required to answer otherwise, it would 'tend to the scandal and subversion of all justice, and those who are the most sincere would not be free from continued columniations.'" *Bradley v. Fisher,* (13 Wall.) 80 U.S. 335 at p. 347, 20 L.Ed. 646 (1871).

In *Barr v. Matteo,* 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959), the Court, speaking through Mr. Justice Harlan, began its Opinion, saying:

"We are called upon in this case to weigh in a particular context two considerations of high importance which now and again come into sharp conflict—on the one hand, the protection of the individual citizen against pecuniary damage caused by oppressive or malicious action on the part of officials of the Federal Government; and on the other, the protection of the public interest by shielding responsible governmental officers against the harassment and inevitable hazards of vindictive or ill-founded damage suits brought on account of action taken in the exercise of their official responsibilities."

The Court in *Barr* sustained the immunity of a federal rent control official against liability in a defamation action, saying at page 572, 79 S.Ct. at page 1340:

"The privilege is not a badge or emolument of exalted office, but an expansion of a policy designed to aid in the effective functioning of government. The complexities and magnitude of governmental activity have become so great that there must of necessity be a delegation and redelegation of authority as to many functions, and we cannot say that these functions become less important because they are exercised by officers of lower rank in the executive hierarchy.

\*   \*   \*   \*   \*   \*

(p. 575, 79 S.Ct. p. 1341) The fact that the action here taken was within the outer perimeter of petitioner's line of duty is enough to render the privilege applicable, despite the allegations of malice in the complaint, \* \* \*."

In *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), Chief Justice Burger, speaking for a unanimous court (except for Mr. Justice Douglas, who took no part), reversed dismissal of suits under 42 U.S.C. § 1983 by personal representatives of students killed by gunfire on the Kent State University campus. The suits were brought against the Governor of Ohio, the Adjutant General of the Ohio National Guard, various other Guard officers and enlisted men, and the University president. The trial court had dismissed the action as in effect against the State of Ohio and thus barred by the Eleventh Amendment, and

---

**2.** Donald Pressentin, an original defendant, was an investigator for the Wisconsin Board of Medical Examiners up to December 31, 1965. He was dismissed from the case by the 1975 order because of the statute of limitations then considered applicable. Any wrongful action on his part between June 11, 1964 and his leaving the Board might be actionable.

the Court of Appeals had affirmed on the alternative ground of the common law doctrine of absolute executive immunity. The Court held the Eleventh Amendment no bar to suits against individuals, and the immunity of public officials "not absolute." The opinion observed, starting at p. 249, 94 S.Ct. at p. 1693:

"These cases in their present posture, present no occasion for a definitive exploration of the scope of immunity available to state executive officials * * *. In dismissing the complaints, the District Court and the Court of Appeals erroneously accepted as a fact the good faith of the Governor and took judicial notice that 'mob rule existed at Kent State University.' There was no opportunity afforded petitioners to contest the facts assumed in that conclusion. * * * Further proceedings, either by way of summary judgment or by trial on the merits is required. The complaining parties are entitled to be heard more fully than is possible on a motion to dismiss a complaint."

In *Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975), the Supreme Court of the United States again addressed the matter of official immunity in the context of the members and administrators of an Arkansas school board being sued under § 1983 by students claiming infringement of their constitutional rights by expulsion from school. A court of appeals' judgment sending the case back to the district court for a new trial was vacated and the case was remanded to the appeals court for determination of a question involving alleged procedural due process; but on the question of the extent of the qualified immunity of the public officials involved, the Court, speaking through Mr. Justice White, said, in concluding Part II of the opinion, at page 322, 95 S.Ct. at page 1001:

"A compensatory award will be appropriate only if the school board member has acted with such an impermissible motivation or with such disregard of the student's clearly established constitutional rights that his action cannot reasonably be characterized as being in good faith."

In that case *(Wood v. Strickland, supra)*, four justices, who concurred in the judgment and all other parts of the opinion, felt it necessary to, as they said, "dissent from Part II which appears to impose a higher standard of care upon public school officials, sued under § 1983, than that heretofore required of any other official."

■ It would thus appear that the present test for immunity from liability for damages arising out of official conduct is simply whether the conduct can "reasonably" be characterized as having been taken "in good faith." The objective facts and subjective motivations[3] must be looked at in each case to make that determination, and four of the nine justices of the Supreme Court of the United States believe that this statement of the test understates, in general, the degree of immunity which is appropriate for public officials, at all levels of public responsibility, in the performance of their duties.

■ Plaintiff, in his brief, appears to agree with this statement of the test, arguing only that defendants are shown to have been guilty of bad faith, or that there are genuine issues of fact on that question.

That the question is essentially one of law, determinable on motion for summary judgment, is expressly recognized in *Scheuer, supra.*

### THE TEST APPLIED

While not really dealing with the question of immunity, the magistrate's procedure, on this second motion for summary judgment, involved, under a local rule or practice, a set of proposed "Findings of Fact" by the movants (defendants), objections thereto by plaintiff, and evaluation of the proposals and objections against the

---

3. In *Wood*, at p. 321, 95 S.Ct. 992, the opinion says that the proper test contains both objective and subjective elements.

record by the magistrate, with aid of argument from the parties, in the process of deciding whether, in fact, any genuine issues of material fact do exist. That process resulted in proposed findings of fact by the magistrate in the Report and Recommendation, as amended, referred to above. Those recommended findings have been specifically commented upon by the parties. Those proposals, and the magistrate's justifications therefor, along with subsequent comments of the parties thereon, are of immense help in applying the test for official immunity in relation to the motion under consideration.

Of course, pursuant to prior order of court, the magistrate applied the two-year statute of limitations in certain considerations, and those considerations require specific review.

With respect to defendant Tormey, the magistrate proposes a finding that "he has never conveyed false information" since June 11, 1968 (the two-year cutoff date), recognizing an earlier letter containing a misstatement that plaintiff had been found guilty of attempting to bribe a judge. Running this point out reveals that one or more of the letters which plaintiff complains about were dated prior to June 11, 1964, outside the six-year limitations' period,[4] and that factual correction was indisputably issued when the error was called to Dr. Tormey's attention. Even more important, however, the overall circumstances of plaintiff's real adventures with the criminal law clearly justify misunderstanding of the legal technicalities on the part of Dr. Tormey, and provide no basis whatsoever to question his good faith to any degree or in any way.

The change in applicable statute of limitations does not appear to have affected the magistrate's considerations with respect to defendants Dalton and Ross. The magistrate did not consider any problem with former defendant Pressentin, who had been dismissed out of the case wholly on the basis of the statute of limitations. As noted above, any showing of "bad faith" action with respect to plaintiff between June 11, 1964, and his departure from the Board on December 31, 1965, might be actionable through the first count, if outside such immunity as his position might involve. None such, however, has been called to the court's attention (or been found), which could reasonably be said to indicate anything but good faith performance of his official duties as investigator for the Wisconsin Board. Objective reading of minor contradictions plaintiff developed, by going back to people the Board investigators had interviewed and quoted, or paraphrased, tend in general to show objectivity and good faith rather than the contrary.

Application of the test for official immunity, as here argued by defendants, of course, does not involve determination whether there is a genuine issue of material fact on the issue of liability in the absence of such immunity, but, rather, whether there is any evidence, sufficient as a matter of law, to permit a determination that good faith performance of public duty may reasonably be questioned. If "Yes," there is no immunity; if "No," the motion for summary judgment under consideration must be allowed by applying defendants' qualified immunity as Wisconsin public officials.

There is nothing in the magistrate's recommended findings, nor in defendants' proposed findings, to indicate a "Yes" answer to that question. It remains to examine carefully plaintiff's comments and objections for such evidence, because none is otherwise apparent to the court from the record.

Plaintiff has filed a 64-page Response to the motion, accompanied by a second volume containing (1) affidavit of one of his new lawyers stating the difficulty of getting documents authenticated in the short time since he was retained; (2) affidavit of plaintiff himself, largely consisting of a partial calendar of events in his life since

---

4. One letter, apparently addressed to an Illinois official, was dated July 22, 1964, and referred to charges before the Wisconsin Board.

1950; (3) affidavits of Clark R. Mollenhoff, a newspaper reporter, Herbert L. Usow, a former attorney for plaintiff, and of David Zweifel, another reporter; and (4) some 27 other documents, some multi-page and otherwise subdivided, consisting of miscellaneous documents, each labeled "Pl. Ex. _____," including (a) what purport to be minutes of the Wisconsin State Board of Medical Examiners for certain meetings in 1956, 1957, 1964, and 1968; (b) various letters signed by defendants Tormey and Dalton and others; (c) a printed report of the Board's recommendation against restoration of plaintiff's Wisconsin license in 1965–66, containing findings and conclusions, addressed to Honorable John A. Decker, Judge of the Wisconsin Circuit Court, who had revoked the license in 1962; (d) various other letters, some keyed to alleged "inaccuracies" in investigative reports to the Wisconsin Board; and (e) an opinion of a then lawyer for plaintiff on various reports of opinions expressed to investigators for the Board, etc.

Plaintiff has also filed a separate 24-page Response to Defendants' Proposed Findings of Fact and Conclusions of Law and Plaintiff's Proposed Conclusions of Law, as well as a 15-page Response to the U. S. Magistrate's Recommendations, a two-page Response to Defendants' Objections to Said Report and Recommendation, as amended, a Supplemental Brief, pursuant to leave of court, after oral argument December 15, 1977, on the subject motion, and a five-page Response to Defendants' Memorandum Brief in Reply to Plaintiff's Supplemental Brief. He has had the last word.

The court has reviewed the documents filed and all references therein to definitive material, has not been concerned about any lack of authentication of apparent evidentiary documents, and has considered all of the material before it in relation to the allegations of the complaint and plaintiff's arguments against application of the doctrine of official immunity. In over ten years, plaintiff has had a full opportunity to develop any evidence of bad faith, has apparently devoted constant effort to doing so, and has had full opportunity to be heard. Objective consideration of all of that material, individually and as a whole, does not help plaintiff on this issue.

Plaintiff and his family are, no doubt, thoroughly convinced of a "vendetta" against him by defendants and former defendants; but such feelings and suspicions, however sincere and deeply held, do not remove the defendants here from that group categorized by Mr. Justice Harlan in *Barr, supra,* as "responsible governmental officers," or remove plaintiff's supposed cause from the description, "vindictive or ill founded damage suits brought on account of action taken in the exercise of their official responsibilities." (360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434). Defendants are entitled to such immunity from harassment as the law does afford persons carrying the important public responsibility which defendants did at the times here pertinent, and bitter disapproval by persons damaged thereby, financially and otherwise, is to be expected.

Based on its own consideration of the record here, this court cannot disagree with the new [5] "findings of fact" with respect to defendants Dalton and Tormey, as recommended by the magistrate; but even if the court were to make *ALL* of the findings in the plaintiff's "Proposed Statement of Facts," as filed on May 20, 1977 (which it is by no means willing or able to do), it is the judgment of this court that plaintiff would fail to make a case against any defendant to prevent application of the present doctrine of limited or qualified immunity as the public official he was.

It is clear that, in addition to asking the Board for a recommendation that his Wisconsin license be restored, plaintiff, with the help of his son Perry, organized a petition for a presidential pardon and recruited reporters to write news stories about his problems and efforts at vindication, to the general effect that, having paid his debt to society by fines and imprisonment for his

---

**5.** As distinguished from the "Uncontroverted Facts" in the 1975 Opinion and Order.

felony convictions, he should be allowed to practice medicine in Wisconsin again, without mention or concern for the character qualifications required of new applicants for license so to do. A well-orchestrated campaign against the Board is quite clearly shown. Any unreasonable questioning of motives, or possible development of vendetta, would appear more reasonably chargeable to plaintiff's side of this controversy. The Wisconsin Board and its members and advisers involved here appear to have operated with reserve, fully in the open, stating their reasons for decision publicly; and, in the view of this court, on this record, have done so with uncommon restraint. Plaintiff has been licensed since 1966 in at least six jurisdictions, including Illinois where he resides, without any formal opposition from any defendant.

Essentially all that plaintiff and three sets of counsel have developed since the case was filed in 1970, or before, which is said to indicate any bad faith, is:

(1) The alleged plan to obtain a temporary Wisconsin license only as an aid in obtaining an Illinois license. The idea is said to have originated with a representative of the Wisconsin Board (not Dalton, Tormey, Pressentin, or Ross). Plaintiff, however, did willingly participate in the plan, which was later reported against him as indicating a character flaw. No entrapment is indicated by any defendant, but a willingness of plaintiff to gain his ends by subterfuge is clearly shown.

(2) A news reporter's opinion that defendant Dalton was "hostile" to plaintiff in 1968, and another news reporter's quotation of Dalton in 1968 that "he believed it was his duty * * * that he do everything he possibly * * * could to make sure this guy does not practice medicine." It might be observed that strongly held convictions of public duty do not even suggest "bad faith," although possibly often so characterized by persons who do not agree with them.

(3) Various routine inquiries or responses involving plaintiff between the Wisconsin Board and medical boards in other states.

It takes a one-track vindictive reading of this correspondence to consider it anything but objective and factual. Any other course could well have been considered malfeasance. The one exception, of course, is defendant Tormey's reference to "conviction" for bribing, or attempting to bribe, a judge, when, in fact, bribery was only a charge on which there was an acquittal, and the actual conviction was for attempting to obstruct justice. As observed above, a physician's failure to make this distinction is not surprising, and it is certainly no indication whatsoever of bad faith. On the other hand, correction of such an error upon discovery is evidence of good faith performance of public duty, as is the record in the Board minutes that defendant Tormey made a motion to recommend relicensure of plaintiff.

(4) The alleged slander committed by Dr. Ross relating to abortion, in an interview by news reporter Margaret Bauman, in late May or early June, 1968, who, incidentally, was recruited by Perry Margoles, and who also confused the obstruction of justice conviction with one for bribery. Ms. Bauman relates on deposition that Dr. Ross told her plaintiff could get his license back by proving he was of good moral character. She said that when she asked, "Is he an abortionist?" Dr. Ross "kind of hemmed and hawed about it," and that "there was evidence, which he implied really wouldn't stand up in court." There is no doubt that such evidence existed, though it was disputed, somewhat discredited, and it was never acted upon. She also said she didn't recall his exact words, and she wrote a story about supposed Margoles hardships and efforts for a presidential pardon, which didn't get published and which didn't mention abortion.

(5) The court views plaintiff's arguments about alleged withholding of information favorable to plaintiff as pure "smoke" on this issue.

The 1975 decision of this court did find some genuine issues of material fact for trial, which, absent the doctrine of limited official immunity, would have justified a

trial in this case. Unless that important doctrine is completely ignored, however, and unless state officials in charge of licensing physicians to treat the physical and mental ills of the public must perform their routine functions in constant danger of personal liability, without even a privilege of informal exchange of information with similar officials in other states, or a privilege of some degree of candor with news people who are sent to them, the doctrine of immunity does protect the defendants here from this lawsuit. To hold otherwise would make impossible any degree of professional discipline, even by one's peers within the profession.

There is no doubt that the questioning by plaintiff of the good faith of defendants here, whether considered objectively, subjectively, or both, is simply not reasonable. The fact that such questioning by plaintiff exists, however strenuously, does not even tend to make it appear reasonable. It is clear that defendants believed plaintiff's conviction of felony, obviously involving moral turpitude, with no showing of, or apparent concern for showing of, any contrition, required their withholding of favorable recommendation on his demands and their discreet dissemination of facts to other medical licensing authorities. They talked conscientiously to newsmen plaintiff sent to them. They did not do more. If they had done less, that could well be a basis for questioning their performance of public duty. If acting as they did in this case could subject them to personal liability, their effective public service would be destroyed. This record clearly supports the conclusion that the doctrine of qualified immunity is applicable to all defendants with respect to this suit. There are no issues of fact for trial in that regard, and the present motion must be allowed.

Accordingly, IT IS ORDERED that defendants' second motion for summary judgment is ALLOWED, and the clerk is directed to enter judgment for defendants.