Dr. Milton MARGOLES,
Plaintiff-Appellant,

v.

Dr. Thomas W. TORMEY, Jr. and Leroy L. Dalton, Defendants-Appellees.

No. 80–1176.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 12, 1981.

Decided March 12, 1981.

As Amended March 18, 1981.

---

lated the constitutional rights of an applicant for medical licensure in another state by knowingly providing allegedly false information about the applicant to the licensing authorities of the second state. Plaintiff, Dr. Milton Margoles, appeals from the judgment of the district court awarding judgment notwithstanding the verdict to defendants. We affirm.

## I

For many years prior to 1962, plaintiff was licensed as a physician in Wisconsin and in several other states; he practiced medicine primarily in Milwaukee, Wisconsin. In June, 1960, plaintiff was convicted of several violations of the Internal Revenue Code and was sentenced to serve one year in prison and to pay $15,000 in fines. On October 12, 1960, plaintiff was convicted of attempting to influence an officer of the court and to obstruct justice and was sentenced to serve five years in prison and to pay $5,000 in fines. Plaintiff also was acquitted of a charge of attempted bribery. On June 6, 1961, plaintiff was convicted of communicating with a juror and was sentenced to serve six months in prison and to pay $1,000 in fines.

Pursuant to an action commenced by the state district attorney, and pursuant to a recommendation of the Wisconsin State Board of Medical Examiners ("Board"), plaintiff's license to practice medicine and surgery in Wisconsin was revoked on February 26, 1962 by the Circuit Court of Milwaukee County.[1] Following plaintiff's convictions and the revocation of his Wisconsin license, his physician's licenses in other states also were revoked or suspended by those states. Plaintiff was released from prison on parole on September 15, 1962. His parole term expired in September, 1966.

Following plaintiff's release from prison, plaintiff commenced an unsuccessful cam-

Dan Walker, Oak Brook, Ill., for plaintiff-appellant.

Charles R. Larsen, Asst. Atty. Gen., Dept. of Justice, Madison, Wis., for defendants-appellees.

Before SPRECHER and CUDAHY, Circuit Judges, and SPEARS, Senior District Judge.[*]

SPRECHER, Circuit Judge.

This appeal presents the question of whether the officials of one state have vio-

* Honorable Adrian A. Spears, Senior District Judge for the Western District of Texas, is sitting by designation.

1. In Wisconsin, revocation of medical licenses is performed by the circuit court. Wis.Stat. § 448.18(2) (1977). Relicensure also is accomplished by the circuit court, but only upon the written recommendation of the Board. Wis. Stat. § 448.18(4) (1977).

paign to regain his Wisconsin medical license. Formal hearings were held in 1965 and 1969 by the Wisconsin State Board of Medical Examiners on plaintiff's applications for relicensure, both resulting in recommendations by the Board that plaintiff be denied relicensure. The latter denial of licensure was upheld by the Wisconsin Supreme Court. *Margoles v. State Board of Medical Examiners,* 47 Wis.2d 449, 177 N.W.2d 353 (1970). Plaintiff also sought, with mixed results,[2] licensure in other states, including Illinois.

This suit concerns plaintiff's attempts in 1964–65 and in 1969 to gain licensure in Illinois. This case, originally filed on June 11, 1970, has taken a tortuous route,[3] culminating in a five day jury trial in December, 1979 before Judge Crabb of the United States District Court for the Western District of Wisconsin. The defendants before us now are Dr. Thomas W. Tormey, Jr. and LeRoy L. Dalton, individually and in their official capacities. Tormey served as a member and Secretary of the Board from July, 1953 through July, 1963, and from July 1965 through July, 1973. He was employed by the Board as Executive Secretary from July, 1963 through July, 1965. Throughout this period, Tormey was responsible for handling the correspondence of the Board. Defendant Dalton was employed since 1955 as an assistant attorney general for the State of Wisconsin. Dalton acted as counsel to the Board from June, 1968 through 1970. The Board is responsible for licensing physicians in Wisconsin. It also regularly corresponds with licensing authorities of other states regarding either applicants before the Board or applicants seeking licensure in another state who have some connection to the Wisconsin Board. This suit concerns correspondence by the Board or by Tormey to Illinois licensing authorities during the time plaintiff was seeking licensure in Illinois.

In a pre-trial order entered on December 17, 1979, Judge Crabb ruled that plaintiff would be entitled to relief under 42 U.S.C. § 1983 if he proved that "defendants, acting under color of state law, and acting from motives of malice, ill will, or vindictiveness, prevented or attempted to prevent him from pursuing his profession." No. 70–C–151, Mem.Op. at 3. Judge Crabb reasoned that plaintiff's " 'liberty' interest would seem to encompass having a fair chance to apply, pursue, or compete for employment opportunities without intentional, malicious interference by state officials." Mem.Op. at 3–4. But Judge Crabb warned that plaintiff would have to prove "defendants'

---

**2.** The record is somewhat unclear, but it appears that plaintiff has been granted licenses in California, the District of Columbia, Indiana, Michigan, New Jersey and Vermont. After the filing of the original complaint in this suit in 1970, plaintiff was granted a license by the State of Illinois. But, the current status of that license apparently is contested as a result of events unrelated to this proceeding.

**3.** This suit originally was in four counts against numerous defendants who were members of or connected with the Board. On July 25, 1975, Judge Morgan, then presiding over this case, granted summary judgment in favor of all defendants as to counts two, three, and four. With respect to count one, Judge Morgan granted summary judgment to all defendants except the defendants here, Dr. Thomas W. Tormey, Jr. and LeRoy L. Dalton. *Margoles v. Ross,* 67 F.R.D. 666 (W.D.Wis.1975).

Subsequently, on February 23, 1978, Judge Morgan granted summary judgment to the remaining defendants on the grounds of qualified official immunity. *Margoles v. State Board of Medical Examiners,* 446 F.Supp. 959 (W.D.Wis. 1978).

On appeal to this court, we reversed the grant of summary judgment based on qualified immunity. We held that there were triable issues of fact concerning the defendants' good faith. We also affirmed the award of summary judgment as to the other defendants and the other counts. *Margoles v. Ross,* 588 F.2d 832 (7th Cir. Unpublished Order 1978).

When the case finally went to trial it involved Tormey, Dalton, and a third defendant, Donald Pressentin. Pressentin earlier had been dismissed on the basis of the first summary judgment decision, but later was reinstated. At the close of plaintiff's case, the district court granted a directed verdict in favor of Pressentin. Plaintiff does not contest the propriety of that action.

active involvement in or distortion of the licensing procedures" of the other states. Mem.Op. at 4.

Plaintiff's case, as finally presented to the jury, concerned only incidents in 1964 and 1969. The 1964 matter involved an unsolicited letter sent by Tormey on behalf of the Board to the Illinois licensing authorities requesting information about plaintiff's attempts to be licensed in Illinois. The letter incorrectly stated that plaintiff had been convicted of attempting to bribe a judge, when, in fact, plaintiff had been acquitted of that charge and had been convicted of the lesser charge of attempting to influence an officer of the court and to obstruct justice. According to plaintiff, when he appeared before the Illinois licensing board, the board's chairman confronted plaintiff with Tormey's letter and accused plaintiff of lying to the Illinois authorities by not disclosing his conviction for attempted bribery. Plaintiff contends that this incident severely prejudiced plaintiff's credibility before the Illinois authorities and was instrumental in denial of licensure.

Plaintiff and his son testified that they had met with Tormey some time prior to the date of this letter and had requested that Tormey stop stating that plaintiff had been convicted of attempted bribery. Tormey testified that the mistake was inadvertent—that he did not understand or appreciate the legal distinction between attempt to bribe a judge and attempt to influence an officer of the court and to obstruct justice. There also was testimony that, after being confronted with Tormey's inaccurate

letter, plaintiff presented to the Illinois authorities a certified copy of a statement from the Clerk of Court stating correctly the charges of which plaintiff had been convicted.

After the denial of licensure following the 1964–65 events, plaintiff again petitioned the Medical Board of Illinois for licensure. Hearings were held in September, 1969. Shortly before the Illinois hearings, plaintiff and his son met with Tormey in Tormey's medical office to discuss the issue of an affidavit plaintiff had given to the Board in 1967.[4] At this meeting, Tormey agreed to, and did, execute a letter dated September 19, 1969 to the Medical Board of Illinois stating, *inter alia*, that the Board, not plaintiff, had first suggested that plaintiff file the affidavit promising not to practice in Wisconsin if a Wisconsin license were issued and used for purposes of securing an Illinois license. Tormey gave the letter to plaintiff for plaintiff's use in the following week's Illinois hearings.

Before those hearings were held, however, Tormey reconsidered his statement regarding the origin of the affidavit idea and concluded that, in fact, plaintiff, not the Board, was responsible for the affidavit idea. Tormey consulted with Dalton, legal counsel to the Board, regarding the proper way of correcting the error contained in the first Tormey letter. Tormey and Dalton agreed that a second letter to the Illinois authorities correctly stating Tormey's view of the 1967 affidavit incident was necessary.[5] Consequently, Tormey prepared a second letter stating that the affidavit idea

---

4. The affidavit stated that if plaintiff were granted a Wisconsin medical license, "the same will be used merely for the purpose of securing an Illinois license to practice medicine, and will be voluntarily surrendered."

Although the origin of the proposal included in the affidavit was and still is hotly disputed, the Board based its 1967 recommendation of licensure denial in large part upon the unethical nature of the idea propounded by the affidavit. The Illinois authorities subsequently became equally concerned about the propriety of this affidavit.

5. Dalton's role in preparing this letter is the primary link between Dalton and any alleged deprivation of plaintiff's constitutional rights. The testimony regarding Dalton's role was contradictory and hotly disputed. But, because of our disposition of this case on the legal questions presented, we need not discuss or decide the specifics of Dalton's role. We assume for purposes of this opinion that Dalton actively assisted Tormey in the preparation of a second letter.

originated with plaintiff or plaintiff's attorney.[6] This letter, dated September 24, 1969, was sent directly to the Medical Board of Illinois. Plaintiff never received a copy of the letter and was never informed of the corrections made by Tormey until confronted with the letter by the Illinois authorities after plaintiff had tendered the first Tormey letter. Plaintiff again claims that his credibility before the Illinois authorities was severely prejudiced and that he again was denied an Illinois license in large part because of this incident.

The case was submitted to the jury with seven special interrogatories. Interrogatories 1 and 2 asked whether Tormey had violated plaintiff's constitutional right to obtain a fair hearing in Illinois by sending the 1964 letter misstating plaintiff's convictions, and, if so, whether Tormey acted in bad faith or without a reasonable belief that his act was constitutional. The jury concluded that the 1964 letter did not violate plaintiff's rights and, consequently, did not reach the question of Tormey's good faith.

Interrogatories 3 through 7 asked whether the sending of the second 1969 letter violated plaintiff's right to obtain a fair hearing, whether Dalton participated in the drafting of this letter, and whether Dalton or Tormey acted in bad faith or without a reasonable belief that his act was constitutional. The jury answered all five interrogatories in the affirmative, concluding that plaintiff's rights had been violated.

On January 10, 1980, Judge Crabb issued an Opinion and Order granting defendants' motion for judgment notwithstanding the verdict with respect to the 1969 incident. Judge Crabb reasoned that plaintiff's evidence failed to establish the prerequisites of the constitutional theory set forth in the pretrial order, and that, as a matter of law, that constitutional theory was erroneous. Plaintiff appealed to this Court.

**II**

Plaintiff urges upon this Court the legal theory of the district court's pretrial order—that plaintiff has a "liberty" interest in "having a fair chance to apply, pursue, or compete for employment opportunities without intentional, malicious interference by state officials." Mem.Op. at 3–4. Plaintiff also accepts the district court's reasoning that for plaintiff to prevail on this theory he must prove "defendants' active involvement in or distortion of the licensing procedures" of Illinois. Mem.Op. at 4. With regard to the facts of this case, plaintiff argues that Tormey and Dalton violated plaintiff's constitutional rights by intentionally supplying damaging, false information to the Illinois licensing authorities. Plaintiff asserts that the information denied plaintiff a fair hearing in Illinois and was instrumental in the denial of plaintiff's application for licensure.

We acknowledge that plaintiff has a protected liberty interest in pursuing his profession and that Illinois cannot, on an arbitrary or procedurally unfair basis, prohibit him from practicing his profession. *See Willner v. Committee on Character*, 373 U.S. 96, 102, 83 S.Ct. 1175, 1179, 10 L.Ed.2d 224 (1963); *Schware v. Board of Bar Examiners*, 353 U.S. 232, 238–39, 77 S.Ct. 752, 755–56, 1 L.Ed.2d 796 (1957). Consequently, if plaintiff can establish that defendants, under the color of law, have interfered with that right and are not protected by qualified immunity, he has established a claim cognizable under 42 U.S.C. § 1983.

To determine whether plaintiff has established any deprivation of his constitutional rights, we must analyze carefully the exact nature of the right asserted and the alleged interference with that right by defendants.

**A**

 First, there is no allegation that the Illinois authorities denied plaintiff a fair

---

**6.** Tormey also offered his personal opinion that plaintiff had offered the affidavit without any intent to deceive the Board.

hearing on his application for licensure. Abundant and uncontradicted evidence established that plaintiff was afforded extensive opportunities to be heard, to present witnesses and documentary evidence, and to appeal any adverse decision.[7] The record shows that plaintiff repeatedly met, either formally or informally, with the Illinois licensing authorities, often discussing plaintiff's criminal convictions or the origin and nature of the 1967 affidavit. Even assuming the Wisconsin authorities provided the Illinois authorities with false information about plaintiff, it is clear that the Illinois authorities granted plaintiff a full opportunity to refute it. In addition, plaintiff does not contend that the refusal of the Illinois authorities to grant him a medical license was arbitrary or erroneous. Consequently, we hold that there was no foreclosure by any Illinois authorities of plaintiff's rights to procedural due process.

### B

▉ The second possible theory for plaintiff is that defendants took such an active role in the Illinois proceedings that their actions interfered unconstitutionally with plaintiff's right to obtain a fair hearing before the Illinois licensing authorities. But, we agree with that portion of the district court's opinion holding that plaintiff had failed to prove defendants' *active involvement in or distortion of* the Illinois proceedings. The record simply does not establish anything more than that the de-

fendants provided allegedly false information to the Illinois authorities responsible for providing plaintiff with a fair hearing on his application for licensure. It would be a significantly different case if there were some evidence of collusion, conspiracy, or agreement between the government officials involved.[8] Lacking such evidence in this case, we must conclude that plaintiff failed to establish any constitutional deprivation as a result of defendants' limited involvement in the Illinois proceedings.

### C

The remaining issue is whether plaintiff has established a denial of any constitutionally protected liberty interest by proof that defendant officials knowingly and maliciously supplied damaging false information about plaintiff to the authorities of another government entity that was considering plaintiff's application for professional licensure.[9] The question is whether plaintiff has established a claim for deprivation of a protected liberty interest or merely has stated a traditional common-law claim for defamation. Stated in this manner, plaintiff's case falls clearly in line with the cases developing from *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), and *Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976).

In *Roth*, although the Supreme Court did not find that there had been any violation of the plaintiff's constitutional rights,[10] the Court set forth, in general terms, the cir-

---

7. Plaintiff did not appeal either denial of licensure by the Medical Board of Illinois.

8. We believe it is unnecessary and inappropriate for this Court to resolve the difficult question of whether a claim could be established under 42 U.S.C. § 1983 by a showing that an official of one state or government entity took such an active role in the proceedings of a second state or entity, short of collusion, conspiracy, or agreement, that the official could be guilty of denying an individual his constitutional right to a fair hearing before the second entity. The facts of this case simply do not require us to reach that weighty question, and we reserve it for another day.

9. We assume for purposes of this discussion that defendants did maliciously or in bad faith provide false information about plaintiff to the Illinois authorities. But, we believe there are very serious questions whether plaintiff, in fact, did prove either falsity or maliciousness.

10. In *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), the Supreme Court held that a state's refusal to rehire a nontenured faculty member without providing him with a hearing or an explanation of reasons was permissible. In *Roth*, the terminated faculty member had no property interest in continued employment at the expiration of his one-year contract, and the state officials, in refusing to re-hire plaintiff, had not "imposed

cumstances where defamatory statements by public officials may implicate protected liberty interests. The Court set forth the rudiments of the "stigma plus" test—that where, in the process of terminating or refusing to rehire a public official, the state makes "any charge against him that might seriously damage his standing and associations in the community." 408 U.S. at 573, 92 S.Ct. at 2707, due process requires that the individual be afforded an opportunity to refute the charge. Charges that might implicate a person's "good name, reputation, honor, or integrity" would include charges such as "that he had been guilty of dishonesty, or immorality." *Id.*

The scope and limitations of the "stigma plus" test were clarified in *Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976).[11] The question presented to the Court was whether the officials' defamation of plaintiff, "standing alone and apart from any other governmental action with respect to him, stated a claim for relief under 42 U.S.C. § 1983 and the Fourteenth Amendment." 424 U.S. at 694, 96 S.Ct. at 1157. The Court concluded that damage to one's reputation alone, even though inflicted by public officials, failed to implicate a protected liberty interest. The Court stated:

> The words "liberty" and "property" as used in the Fourteenth Amendment do not in terms single out reputation as a candidate for special protection over and above other interests that may be protected by state law. While we have in a number of our prior cases pointed out the frequently drastic effect of the "stigma" which may result from defamation by the government in a variety of contexts, this

line of cases does not establish the proposition that reputation alone, apart from some more tangible interests such as employment, is either "liberty" or "property" by itself sufficient to invoke the procedural protection of the Due Process Clause.

424 U.S. at 701, 96 S.Ct. at 1160.

This Court has applied the "stigma plus" test of *Roth* and *Paul v. Davis* in two recent decisions. *Colaizzi v. Walker*, 542 F.2d 969 (7th Cir. 1976), *cert. denied*, 430 U.S. 960, 97 S.Ct. 1610, 51 L.Ed.2d 811 (1977); *Elbert v. Board of Ed.*, 630 F.2d 509 (7th Cir. 1980), *cert. filed*, No. 80–1312 (Feb. 4, 1981). In *Colaizzi*, the court held that plaintiffs had stated a claim under § 1983 where they alleged that in connection with their dismissals from state employment, state officials made defamatory public statements charging plaintiffs with reprehensible conduct. The court read *Paul v. Davis* to mean that "stigma to one's reputation, inflicted by the state, is not of itself a deprivation of liberty within the meaning of the Fourteenth Amendment." 542 F.2d at 973. But, the court reasoned that:

> stigma to reputation (not itself a deprivation of liberty as defined in the Fourteenth Amendment) plus failure to rehire or discharge (not necessarily involving deprivation of property as defined in the Fourteenth Amendment) may nevertheless when found *in conjunction* state a claim under 42 U.S.C. § 1983 for deprivation of a Fourteenth Amendment liberty interest without due process.

*Id.* (emphasis in original). Since there was stigma plus discharge by the state authori-

---

on him a stigma or other disability that foreclosed his freedom to take advantage of other employment opportunities." 408 U.S. at 573, 92 S.Ct. at 2707.

11. In *Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), a photograph of the plaintiff, bearing his name, was included on a printed flyer of so-called "active shoplifters" and was circulated by two chiefs of police to Louisville, Kentucky merchants during the Christmas shopping season. In fact, the plain-

tiff had been arrested for, but not convicted of, shoplifting. After the charge giving rise to his inclusion on the flyer had been dismissed, plaintiff brought a § 1983 action against the police chiefs, alleging that the stain on his reputation resulting from the circulation of the flyer had deprived him of liberty without due process of law. The Supreme Court held that he failed to state a claim for deprivation of any constitutionally protected liberty interest.

ties, we held that plaintiffs had stated a claim for deprivation of a protected liberty interest.

Finally, in *Elbert v. Board of Ed.*, 630 F.2d 509 (7th Cir. 1980), the court refused to find that the "stigma plus" test had been satisfied where, although a defamatory statement had been made by school board officials in connection with the public announcement that the plaintiff would be terminated at the conclusion of the school year, plaintiff later was rehired and was never terminated. The court reasoned that since no loss of employment ever occurred, the defamation was not accompanied by the requisite loss of a government employment, right, or privilege. Consequently, plaintiff's allegations constituted nothing more than a claim of common law defamation by state officials. And, the court stated that "[d]efamatory publications by a state official, however seriously they may harm someone, do not deprive that person of any liberty interests protected by the due process clause." 630 F.2d at 512, citing *Paul v. Davis*, 424 U.S. at 712, 96 S.Ct. at 1165.

We must now apply the "stigma plus" test as developed in this line of cases to the facts of this case. Even if we assume that plaintiff has proved a "stigma" as a result of defendants' correspondence with Illinois authorities incorrectly characterizing plaintiff's criminal convictions and falsely accusing plaintiff of originating the affidavit idea, the "stigma *plus*" test is not satisfied. Plaintiff has failed to prove that these defendants were connected with any denial of a government benefit or privilege, i. e. licensure. The affiliation between stigma and denial of a government benefit is absent. Although defendants' actions may have imposed a stigma on plaintiff's reputation, plaintiff's claim fails to establish that defendants' defamation was "*in conjunc-*

*tion*" with the denials of licensure in Illinois. The Illinois authorities and the Illinois denials of licensure were separate and distinct from any defamatory statements made by these Wisconsin officials.

Consequently, plaintiff's claim is reduced to an allegation that these defendants made defamatory statements about plaintiff to the Illinois licensing authorities. But, as the Supreme Court in *Paul v. Davis* and this court in *Elbert* held, defamatory statements by public officials, standing alone, are insufficient to state a claim under § 1983. We acknowledge again that "§ 1983 is not, and should not become, a general federal tort law." *Elbert*, 630 F.2d at 513. The district court's grant of judgment to defendants notwithstanding the verdict was appropriate.[12]

### III

For the foregoing reasons, the judgment below is

AFFIRMED.

CUDAHY, Circuit Judge, concurring:

I concur in the reasoning and result of the majority opinion except to the extent that it may suggest that "collusion, conspiracy, or agreement between the government officials involved" would be requisite to a successful Section 1983 claim based on an "interstate" denial of a fair hearing. Where numerous officials in several states are pursuing a virtually joint inquiry into the same questions of the professional qualifications of a particular individual, state boundaries need not provide a shield against constitutional tort liability. The instant case fails essentially for lack of evidence.

---

12. Both parties have presented additional issues regarding jury instructions, discovery issues, the application of qualified immunity, and the *res judicata* effect to be given to state court determinations. In light of our discussion of this case on its merits, and our conclusion that plaintiff does not have a claim under 42 U.S.C. § 1983, there is no reason for this Court to address these issues.