John A. BUXTON, Plaintiff,

v.

George D. LOVELL, Richard J. Lawlor, Robert E. Hill, Jr., Paul S. Campbell, Lenore DeFonso, Individually and as the Duly constituted Members of the Indiana State Board of Examiners in Psychology, Defendants.

No. EV 79–184–C.

United States District Court,
S.D. Indiana,
Evansville Division.

Feb. 1, 1983.

Steve Barber, Lockyear, Barber & Kornblum, Evansville, Ind., for plaintiff.

Barbara J. Marvel, Deputy Atty. Gen., Indianapolis, Ind., for defendant.

## MEMORANDUM OF DECISION

BROOKS, District Judge.

This matter came on for trial before the Honorable Gene E. Brooks, Judge, United States District Court for the Southern District of Indiana, Evansville Division, on the 27th day of July, 1981. The Court having heard the testimony of the parties, having examined their exhibits admitted into evidence, having heard the arguments of coun-

sel, and being duly advised and briefed in the premises, hereby finds the following.

Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the Court enters its Findings of Fact and Conclusions of Law in memorandum form.

The plaintiff, John A. Buxton, filed this action pursuant to Title 42, U.S.C. § 1983, when the defendants, members of the Indiana State Board of Examiners in Psychology, refused to allow him to use the designation "Ph.D." following his name in the yellow pages of the Evansville and Metropolitan Area Telephone Directory. Plaintiff claims that the defendants' actions were arbitrary, capricious, and an unconstitutional infringement upon plaintiff's rights under the First Amendment, and constituted a discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution. Plaintiff's amended complaint also alleges that the administrative process for rectifying his problem is so defective and inadequate that it deprives him of equal protection of the laws and due process of law.

■ The failure to renew plaintiff's Private Practice Certificate or to permit use of the "Ph.D." designation, by the Indiana State Board of Examiners in Psychology (hereinafter referred to as the "Board"), caused the plaintiff to file his complaint on November 2, 1979. An Agreed Judgment Entry was entered into by the parties and approved by this Court on November 8, 1979. Said entry, among other things, provided that plaintiff would be reissued his Private Practice Certificate. The parties stipulated to the Court that they had ". . . arrived at a full and complete compromise and settlement upon all issues except one." The remaining issue as stated in the Agreed Entry is as follows:

That if the defendants question the plaintiff's continued use of the "Ph.D." designation, such question must be presented to this Court on or before January 1, 1980, and if not so presented, said question is waived, and this Order becomes a final judgment against the defendants on said date.

Subsequently, the Board sought a ruling on the "Ph.D." designation. The request by the Board to review this matter was made through a "Motion to Determine Issue," receipted by the Clerk on January 3, 1980. This Court, in its Order dated March 31, 1980, held that it would rule on the propriety of using the "Ph.D." designation in the plaintiff's advertising since the certificate of service disclosed that said motion was mailed on December 31, 1979. When filing is attempted by mail, the filing is completed when the document is placed in the Clerk's post office box. *Ward v. Atlantic Coast Line Railroad Co.,* 265 F.2d 75 (5th Cir. 1959); *Hetman v. Fruit Growers Express Co.,* 200 F.Supp. 234 (D.N.J.1961); *Johansson v. Towson,* 177 F.Supp. 729 (M.D.Ga. 1959). Thus the issue now before the Court is whether the plaintiff, John Buxton, is entitled to use the title "Ph.D." in connection with his practice of psychology.

I

JURISDICTION

A. ELEVENTH AMENDMENT AND THE DOCTRINE OF SOVEREIGN IMMUNITY

■ Various jurisdictional issues, including immunity due to the Eleventh Amendment, must be addressed in order to properly find that the Court has subject matter jurisdiction. It is axiomatic that "[t]here is never a presumption in favor of federal jurisdiction, but rather the basis for such jurisdiction must be affirmatively evidenced by the party invoking it." *Johnson v. Texas Department of Corrections,* 373 F.Supp. 1108, 1109 (S.D.Tex.1974) (citing *Grace v. American Central Insurance Company,* 109 U.S. 278, 3 S.Ct. 207, 27 L.Ed. 932 (1883)).

■ The Eleventh Amendment of the United States Constitution limits the jurisdiction of the federal courts by providing that "[t]he judicial power of the United States shall not be construed to extend to any suit, in law or in equity, commenced or prosecuted against one of the United States

by citizens of another state, or by citizens or subjects of any foreign state." It is well established that even though a State is not named a party to the action, the test of the Eleventh Amendment's applicability is whether the state is the " 'real, substantial party in interest.' " *Edelman v. Jordan,* 415 U.S. 651, 663, 94 S.Ct. 1347, 1356, 39 L.Ed.2d 662 (1974) (quoting *Ford Motor Company v. Department of Treasury,* 323 U.S. 459, 464, 65 S.Ct. 347, 350, 89 L.Ed. 389 (1945)). Thus, the Court must evaluate whether the suit is in reality a suit against the State, although nominally against an officer, and when it is in reality against the officer named as defendant. Generally decrees requiring an affirmative official action on the part of the defendants, the performance of an obligation which belongs to the state in its political capacity, are suits against the State. Those actions at law or suits in equity which are maintained against defendants who, while claiming to act as officers of the State, violate and invade the personal and property rights of the plaintiff under color of official rights which are unconstitutional and void, are not suits against the State. In this latter case the rationale is that unconstitutional actions by state officials are not the actions of the State itself—because a State "can do no wrong."

These general principles were reaffirmed in *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), in which the Supreme Court held that the Eleventh Amendment did not necessarily bar a claim that named as defendants the Governor of Ohio, the Adjutant General of the Ohio National Guard, various other Guard officers and enlisted members, and the President of Kent State University. The Court held that damages against individual defendants were permissible despite their holding public office since the alleged activities were unconstitutional. As the *Scheuer* Court noted, the Supreme Court established in 1908 that:

> [W]hen a state officer acts under a state law in a manner violative of the Federal Constitution, he "comes into conflict with the superior authority of that Constitution, and he is in that case stripped of his official or representative character and is subjected *in his person* to the consequences of his individual conduct. The State has no power to impart to him any immunity from responsibility to the supreme authority of the United States."

416 U.S. at 237, 94 S.Ct. at 1687 (quoting *Ex Parte Young,* 209 U.S. 123, 159–60, 28 S.Ct. 441, 453–54, 52 L.Ed. 714 (1908). (Emphasis supplied by *Scheuer* Court). In the case at bar, the plaintiff claims the Board's action denying him the use of the "Ph.D." designation in the context of his psychology practice is an unconstitutional action under color of official right and therefore the defendants are stripped of their official character.[1]

The defendants argue that this action is precluded by principles of sovereignty since the relief sought may have some tangential impact on the state treasury. For this proposition the Board members rely upon *Ford Motor Company v. Department of Treasury,* 323 U.S. 459, 65 S.Ct. 347, 89 L.Ed. 389 (1945) wherein recovery of money was sought in the form of refunded

---

1. The plaintiff further argues the Board has waived any defense of the Eleventh Amendment or the Doctrine of Sovereign Immunity which they may have interjected due to the consent judgment being entered into and approved by the Court on November 8, 1979. The consent judgment would have become final judgment on January 1, 1980 had the defendants not sought to resolve the "Ph.D." designation issue. The plaintiff argues that the circumstances of the Board having entered a consent judgment and having initiated determination of the issue at bar through filing a "Motion to Determine the Issue of the Ph.D. Designa-

tion" constitutes a waiver and consent to this Court's jurisdiction. *N.Y.S. Ass'n for Retarded Children v. Carey,* 596 F.2d 27 (2nd Cir.1979); *Atchison v. Nelson,* 460 F.Supp. 1102 (D.C. Wyo.1978). Certainly the facts strongly suggest waiver where the defendants ignore the issue until after entry of a consent judgment and delay further interest in the case until the final hour request for determination of the issues involved herein. Since the defendants are, in essence, the moving party, the Board appears to have waived the jurisdictional issues raised.

taxes alleged to have been illegally collected by the Department of Treasury for the State of Indiana and individuals constituting the "Board of the Department of Treasury." Obviously, refunded taxes would be paid from the State Treasury. In the case at bar, the defendants are named individually and as the duly constituted members of the Indiana State Board of Examiners in Psychology. In this latter context, the defendants are named in their "official capacity" and thus, the award of monetary damages is barred by the Eleventh Amendment. However, the Eleventh Amendment does not proscribe prospective relief against defendants in their "official" capacity. *Owen v. Lash,* 682 F.2d 648, 654 (7th Cir.1982); *Rucker v. Higher Educational Aids Bd.,* 669 F.2d 1179 (7th Cir.1982).

The defendants would have the responsibility to satisfy a money judgment that might be rendered against them in their individual capacity. Thus, the fact that the relief sought may include a monetary judgment does not bar the action by the Eleventh Amendment or sovereign immunity. *See Morrow v. Sudler,* 502 F.Supp. 1200 (D.C.Colo.1980); *Johnson v. Brelje,* 482 F.Supp. 125 (N.D.Ill.1979).

## B. ABSTENTION DOCTRINE

The Board also argues that this Court should abstain from reaching the merits of the plaintiff's constitutional claims. The genesis for this argument lies in a Supreme Court opinion by Mr. Justice Frankfurter ordering "abstention" in *Railroad Comm'n v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). Therein, the Supreme Court held a state administrative order requiring conductors on all sleeping cars was attacked on grounds of racial discrimination under both federal and state law. Finding the state law unclear and the federal constitutional question substantial the court held that when a federal constitutional claim is premised on an unsettled question of state law, the federal court should abstain in order to provide the state courts an opportunity to settle the underlying state-law question. Thus "abstention" serves three functions: the avoidance of unnecessary constitutional questions; the avoidance of unnecessary friction between federal courts and the state; and the avoidance of error in determining the meaning of state law.

The case at bar presents no novel question requiring the use of this judicially created abstention doctrine; it requires instead, only the application of settled principles. The Supreme Court has recently reviewed these principles in *Harris County Commissioners Court v. Moore,* 420 U.S. 77, 83–84, 95 S.Ct. 870, 874–75, 43 L.Ed.2d 32 (1975). In *Harris County,* the Supreme Court reversed the District Court on the merits or, in the alternative, ordered the court to abstain pending the determination of state-law questions concerning the status of local law stemming from an unsettled relationship between the state constitution and a statute involving various state office holders. The Supreme Court noted various cases where they had invoked the "Pullman Doctrine," however, the court warned the District Courts that abstention should be invoked only under "special circumstances." *Id.* at 83, 95 S.Ct. at 875.

Applying the guidelines and given the facts of this case, abstention is unnecessary. First, no action is pending in state court that would resolve the questions underlying the federal claim herein. Secondly, the issues concerned in this matter are not peculiarly within the province of the local courts. Finally, it is not clear that resolution of the interpretation of the psychology statutes involved in this case would necessarily affect the federal claim herein. The Supreme Court consistently requires abstention in those cases where the federal constitutional challenge turns upon a state statute, the meaning of which is unclear under state law. The state statutes in question in this case fail to have been subjected to any state court interpretations. However, the dearth of state court rulings does not render the statutes unclear. Certainly the state courts may be able to construe the issues in a case to avoid the need for a federal constitutional ruling; however, the construction of the statutes in question would not significantly modify the

federal claim. Therefore, the Court finds that the arguments for abstention are not strong, especially since the litigation has already been long delayed. *See Hostetter v. Idlewild Bon Voyage Liquor Corporation,* 377 U.S. 324, 329, 84 S.Ct. 1293, 1296, 12 L.Ed.2d 350 (1964).

## C. EXHAUSTION OF STATE ADMINISTRATIVE REMEDIES

■ The Court addressed the matter of exhaustion of administrative remedies in its order dated March 31, 1980. The plaintiff has alleged and argued that his administrative remedies are inadequate and defective to the point of depriving him of equal protection of the law and due process of law. Consequently, he need not exhaust his state or administrative remedies. *Ellis v. Dyson,* 421 U.S. 426, 95 S.Ct. 1691, 44 L.Ed.2d 274 (1975); *Allee v. Medrano,* 416 U.S. 802, 94 S.Ct. 2191, 40 L.Ed.2d 566 (1974); *Gibson v. Berryhill,* 411 U.S. 564, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973); *Drexler v. Southwest Dubois School Corporation,* 504 F.2d 836 (7th Cir.1974). As the United States Supreme Court has stated:

> ... this Court has expressly held in recent years that state administrative remedies need not be exhausted where the federal court plaintiff states an otherwise good cause of action under 42 U.S.C. § 1983. *McNeese v. Board of Education,* 373 U.S. 668 [83 S.Ct. 1433, 10 L.Ed.2d 622] (1963); *Damico v. California,* 389 U.S. 416 [88 S.Ct. 526, 19 L.Ed.2d 647] (1967).

*Gibson,* 411 U.S. at 574, 93 S.Ct. at 1695–96. Thus, where the Board has revoked the usage by plaintiff of the "Ph.D." designa-

tion in conjunction with plaintiff's psychology practice, but through the Agreed Order plaintiff is not deprived of this usage pending the Court's determination of the issue, the administrative appeal process need not be exhausted.

## D. STATUTORY BASIS

■ Plaintiff's suit is brought pursuant to 42 U.S.C. § 1983. This statute provides:

> Every *person* who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities, secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceedings for redress. (Emphasis added)

A suit brought pursuant to § 1983 must be against "a person." *See generally,* Annot. 56 L.Ed.2d 895 (1978). The defendants argue that since they comprise the members of the Indiana State Board of Examiners, they are not "persons" as defined by the statute.[2] For this proposition they argue the Board is an "alter ego" of the State of Indiana.[3]

This claim has no merit. The members of this Board are the parties in interest since they are named individually and are the "persons" responsible for making a discretionary interpretation and decision. The individual members of this Board are "persons" in the context of § 1983 since Bux-

---

**2.** The Supreme Court has expressly acknowledged:

(1) that local governmental units are within the coverage of § 1983. *Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

(2) that § 1983 does not sweep away the state's Eleventh Amendment immunity especially where a retrospective award requires the payment of funds from the state treasury. *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974).

(3) that a state is not a "person" for the purposes of the due process clause. *See, South*

*Carolina v. Katzenbach,* 383 U.S. 301, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966).

**3.** The United States Court of Appeals for the Seventh Circuit has recently reiterated in *Adden v. Middlebrooks,* 688 F.2d 1147 (7th Cir. 1982), the test to be utilized when determining whether an agency is the alter-ego of the State. The traditional test consists of determining (1) whether the agency is performing a normal governmental function and (2) whether any judgment against the agency would have to be paid out of the State Treasury.

ton's claim alleges that they deprived him of civil rights while acting under color of state law. *See Quern v. Jordan,* 440 U.S. 332, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979). These individuals cannot hide behind sovereign immunity of the state if they have acted unconstitutionally. Even if the Board is classified as an "alter ego" of the state [4] that does not relieve the individual Board members from being sued pursuant to § 1983. *See Rucker v. Higher Educational Aids Board,* 669 F.2d 1179, 1184 (7th Cir.1982). Members of a board can be sued where they have acted unconstitutionally in depriving a license. *See, e.g., Roach v. Atchison, T.S.F.R. Co.,* 218 U.S. 159, 30 S.Ct. 639, 54 L.Ed. 978 (1909); *Herndon v. Chicago, R.I. and P.R. Co.,* 218 U.S. 135, 30 S.Ct. 633, 54 L.Ed. 970 (1909).

Upon this review, the Court finds that it has jurisdiction. Jurisdiction is predicated upon 28 U.S.C. § 1343(a)(3) and (4) (1979) which provides a specific grant of jurisdiction where federal constitutionality is challenged. This Court has jurisdiction to entertain a challenge to the state psychology statutes and regulatory schemes to ensure that these general rules do not impinge upon constitutionally protected rights. *E.g. Hackin v. Lockwood,* 361 F.2d 499 (9th Cir. 1966), *cert. denied,* 385 U.S. 960, 87 S.Ct. 396, 17 L.Ed.2d 305 (1966); *Whitfield v. Illinois Board of Law Examiners,* 504 F.2d 474, 477 (7th Cir.1974). Likewise, as articulated by the plaintiff, this Court has jurisdiction pursuant to 28 U.S.C. § 1331 (1980) which authorizes jurisdiction for civil actions arising under the Constitution. *Ball v. Brown,* 450 F.Supp. 4 (N.D.Ohio 1977).

## II

### FACTS

John A. Buxton, plaintiff, is a psychologist maintaining an office in Evansville, Indiana. The defendants, George D. Lovell, Richard J. Lawlor, Robert E. Hill, Jr., Paul S. Campbell and Lenore DeFonso, were all duly constituted members of the Indiana State Board of Examiners in Psychology in October, 1979 and at all times relevant to the action herein.[5] Defendants were sued individually and as the duly constituted members of the Indiana State Board of Examiners in Psychology.

Mr. Buxton spent his first two years of post secondary education attending the University of Louisville, and transferred for the following two years to the University of Evansville, wherein he received a Bachelors Degree in education in 1957. Upon graduation Mr. Buxton worked as a Director of Alumni Affairs from 1957 through 1959. In 1959 he commenced teaching in the Henderson Public Schools and in the summer of 1962 transferred to the Evansville Day School where the plaintiff worked as a counselor and as a teacher.

In 1964, plaintiff received a Masters' Degree in Education from Indiana University with a concentration in psychology. During this time period, Mr. Buxton continued his teaching and counseling roles at the Evansville Day School until the summer of 1966.

In August of 1966, Mr. Buxton transferred to the Breckinridge Job Corp Center where he became a supervisor of counseling. He remained in this role until August of 1969. While in Kentucky, plaintiff took additional graduate courses. In this graduate level work, Mr. Buxton attended education and psychology courses at Western Kentucky State University and the University of Kentucky on a periodic basis from 1966 through 1968.

In September of 1969, the plaintiff was employed by the Evansville State Hospital as a psychologist, who supervised industrial

---

4. The issue not being dispositive of the case since the United States Supreme Court's reaffirmance of *Edelman, supra* in *Quern v. Jordan, supra* did not render § 1983 meaningless insofar as the states are concerned since prospective relief is certainly available as first discussed in *Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908).

5. The term of defendant Hill as a Board Member ended in July 1980. Defendant Campbell submitted his resignation from the Board in December 1980 and served until replaced in July 1, 1981.

therapy. While Mr. Buxton was employed at the Evansville State Hospital he was under the supervision of a licensed psychologist. Since Mr. Buxton was under the appropriate supervision and had met the statutory prerequisites, he was issued a Basic Certificate by the Indiana State Board of Examiners in Psychology on November 13, 1970. Plaintiff conducted patient testing and evaluation services, as well as counseling, while at the Evansville State Hospital. The plaintiff was subsequently issued a Private Practice Certificate by the Indiana State Board of Examiners in 1972 pursuant to the "grandfather clause" located at Ind.Code 25–33–1–8. (See Plaintiff's Exhibit # 5). This Private Practice Certificate was issued based upon the plaintiff having fulfilled the statutory prerequisites while holding a Masters Degree. The Private Practice Certificate is the highest level of certification offered by the statutory scheme under which the Indiana State Board of Examiners in Psychology must operate.

After seven years as a psychologist at the Evansville State Hospital, plaintiff started a private practice in 1976. It was during this time period that the plaintiff considered completing a Ph.D. Degree. Thus, in 1977, plaintiff applied to Clayton University in St. Louis, Missouri. Prior to plaintiff's enrollment at Clayton University he obtained 62.5 hours in graduate education from Western Kentucky State University, Indiana University, University of Kentucky and three hours of additional credit from Southern Illinois University in 1972. In August, 1978, plaintiff obtained a Ph.D. from Clayton University.

Mr. Buxton knew when he applied at Clayton University that it was not an accredited institution. The Indiana State Board of Examiners in Psychology relies upon *Accredited Institutions of Post Secondary Education* to determine if an institution is accredited, which the Board has determined is the requirement for meeting the statutory definition of a "recognized institution of higher learning." I.C. § 25–33–1–2(f). Clayton University is not listed in *Accredited Institutions of Post Secondary Education*.

Upon Mr. Buxton's receipt of his degree, he continued his private practice of psychology maintaining an office at 111 Main Street, Evansville, Indiana. Also in 1979, plaintiff began advertising himself as "Buxton, John A., Ph.D." in the Evansville Metropolitan Telephone Directory under the heading "Psychologists." The plaintiff likewise made use of the Ph.D. designation on letterheads, business cards, checks and advertisements.

The Board never received notification that plaintiff had obtained a Ph.D. degree from Clayton University. The Board's first knowledge that plaintiff had claimed a Ph.D. came upon a customary review of the advertisement in the Evansville Metropolitan Telephone Directory under the heading "Psychologists" by the Board's Secretary.

Upon the Board's discovery that plaintiff listed a Ph.D. degree following his name in the Evansville Telephone Directory, the Board sent Mr. Buxton a letter dated the 7th day of February, 1979. In subpart, it stated:

> Please be advised that under no circumstances involving your practice as a psychologist, should your name be followed by the degree Ph.D. Any material which advertises or describes your practice or offers your service as a psychologist should be listed under your name with state certified level of your degree, i.e.: John Buxton, M.S.

> If you wish to use your doctoral degree along with your certification status, it will be necessary that you re-apply for a Private Practice Certificate under the provisions in § 6. . . .

(Plaintiff's Exhibit # 6).

Prior to this letter the plaintiff was given no notice or an opportunity to submit evidence or have a hearing regarding his use of the Ph.D. designation. The Board did not make reference to a hearing opportunity at a later date.

On February 12, 1979 Mr. Buxton promptly responded to the Board's letter wherein he stated his inability to find in the

Rules and Regulations of the Indiana State Board of Examiners in Psychology where one must reapply for certification of the same Private Practice Certificate after attainment of a higher academic degree. (Plaintiff's Exhibit # 7). The Board reviewed Mr. Buxton's correspondence at its next meeting and the Board responded that their position had not changed since to do so would be discriminatory against other psychologists similarly situated. The Board's responsive correspondence dated March 2, 1979 stated the issue as follows:

> When the Board certifies a person it must do so on the basis of the credentials presented at that time. To change the basis for certification would be inappropriate without requiring the candidate to reapply and meet the requirements for certification in effect at the time of the application. If you wish to follow this procedure you may ask for a new application, pay the requisite fee, submit educational credentials, and take the required examinations.

(Plaintiff's Exhibit # 9).

Thereafter, correspondence took place between the plaintiff and the executive assistant to Governor Otis Bowen. (Plaintiff's Exhibits # 10 and # 11). The results of this request were inconclusive.

The issue did not resurface until Mr. Buxton filed his biennial renewal notice with the Board on October 3, 1979. (Plaintiff's Exhibit # 21). The Board noted in a letter to Mr. Buxton dated October 25, 1979, that the plaintiff was apparently continuing the practices the Board had instructed him to cease as stated in its letter dated March 2, 1979. The letter from George D. Lovell, Chairman for the Psychology Board, stated that "[u]ntil the Board has evidence that you are complying with the statute and the

Board's rules and policies, we cannot issue you your renewal." (Plaintiff's Exhibit # 13). Shortly thereafter, the plaintiff filed this cause of action on November 2, 1979 and an Agreed Judgment was entered between the parties on November 8, 1979. As a result of their Agreed Judgment, the Board reissued the plaintiff's Private Practice Certificate and permitted him the full use of the title "Clinical Psychologist." The Board re-initiated the issue regarding use of the title "Ph.D." as previously described. The plaintiff was permitted use of his Ph.D. title pending the outcome of this litigation, as stated through paragraph four (4) of the Agreed Judgment Entry. However, the Board's position is that they had the authority to act in the manner they did and that the procedures followed were proper. The Board seeks affirmation of their authority and chosen procedures.

### III

### STATE POWER TO REGULATE THE PSYCHOLOGY PROFESSION

John Buxton claims [6] the psychology statutes I.C. § 25–33–1–1 et. seq. and regulations, 868 I.A.C. et. seq.: (a) violate his freedom of speech pursuant to the First Amendment; or (b) deny him the due process and equal protection guarantees of the Fourteenth Amendment. The substantive question presented here is whether the Board may determine the propriety of John Buxton's use of the "Ph.D." title in connection with his practice of psychology.

### A. FIRST AMENDMENT

Mr. Buxton claims his freedom of speech would be denied if the Board is permitted to refuse him reference to him-

---

6. To state a sufficient claim for relief under 42 U.S.C. § 1983, the plaintiff must allege that the defendants have deprived him of federally secured rights and that the deprivation was accomplished under color of state law. *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). The complaint herein alleges that the overt actions of the defendant Board members, acts done at the Board's direction through the executive secre-

tary, denied plaintiff his right to use the "Ph. D." designation in his psychology practice or in his advertising. These allegations are sufficient to state a claim for relief since they allege an infringement of a protected personal interest. *Massey v. Wilson,* 484 F.Supp. 1332 (D.C. Colo.1980); *see Young v. Peoria Housing Authority,* 479 F.Supp. 1093 (D.C.Ill.1979). Therefore, the complaint sufficiently states a claim upon which relief may be granted.

self as a "Ph.D." The use of a title, such as Ph.D., in conjunction with a professional practice, such as the private practice of psychology, is a form of advertising since it identifies the individual claiming the title, in conjunction with a professional practice, with a quality of service. *See, Friedman v. Rogers,* 440 U.S. 1, 99 S.Ct. 887, 59 L.Ed.2d 100 (1979). As such, it is analyzed as "commercial speech" within the context of the First Amendment which requires the Court to balance the economic nature and interests in the speech against the State's interests in regulating it. *Bates v. State Board of Arizona,* 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977); *Virginia Pharmacy Board v. Virginia Citizens Consumer Council,* 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976).

The application of First Amendment principles to commercial speech is not new. The United States Supreme Court has afforded commercial speech "a limited measure of protection" since it recognizes that "the State does not lose its power to regulate commercial activity deemed harmful to the public whenever speech is a component of this activity." *Ohralik v. Ohio State Bar Ass'n,* 436 U.S. 447, 456, 98 S.Ct. 1912, 1918, 56 L.Ed.2d 444 (1978). The Supreme Court has found that restrictions on time, place or manner of such speech are permissible *Virginia Pharmacy,* 425 U.S. at 771, 96 S.Ct. at 1830, as well as restrictions on false, deceptive, and misleading commercial speech,

> Untruthful speech, commercial or otherwise, has never been protected for its own sake. *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 340 [94 S.Ct. 2997, 3007, 41 L.Ed.2d 789] (1974); *Konigsberg v. State Bar,* 366 U.S. 36, 49, and n. 10 [81 S.Ct. 997, 1005, and n. 10, 6 L.Ed.2d 105] (1961). Obviously, much commercial speech is not provably false, or even wholly false, but only deceptive or misleading. We foresee no obstacle to a State's dealing effectively with this problem. The First Amendment, as we construe it today, does not prohibit the State from insuring that the

stream of commercial information flow cleanly as well as freely.

*Virginia Pharmacy,* 425 U.S. at 771–772, 96 S.Ct. at 1830–31 (footnote omitted).

The Board attempted to regulate Mr. Buxton's use of the title "Ph.D." in advertising his services. For this authority the Board mainly relied upon the legislative declaration of policy which states:

> —It is hereby declared to be the policy of the State of Indiana that it is necessary to specify the qualifications of a psychologist, to establish the nature of psychological practice and to establish and provide for an appropriate regulatory authority, in order to safeguard life, health, property and the public welfare, and in order to protect the people of the state from improper practices resulting from improper use of relevant titles. [Acts 1969, ch. 416, § 1] I.C. 25–33–1–1.

This general policy statement gives the Board broad regulatory authority; however, it is not defined.

 The United States Supreme Court defers to State Legislatures in regulating a state's economic activity even when the regulation affects commercial speech. The Supreme Court has concluded that a state has an interest in protecting the public from misleading speech. The possibilities for the public to be deceived through the use of various title in conjunction with a psychology practice are numerous.[7] Specifically, the use of a "Ph.D." title may be misleading or deceptive among other considerations if it has been conferred in a discipline irrelevant to the practice of psychology or if it has been conferred by an institution not recognized as meeting a minimum standard of accreditation. However, the Board or the State Legislature must first define the regulation in this area. Despite the Board demonstrating a substantial interest in regulating the usage of titles in conjunction with advertising a psychology practice, they must put the profession on notice as to what the regulation will be.

---

7. For instance the regulation of specific titles identifying an individual as a psychologist has been enacted through I.C. § 25–33–1–14 with criminal penalties attaching through I.C. § 25–33–1–15.

The information Mr. Buxton is attempting to disseminate to the public regarding his "Ph.D." qualifications as a psychologist is factually accurate.[8] The plaintiff, though not demonstrating an unbridled First Amendment right to advertise a "Ph. D." in conjunction with his practice, presented proper information to the public. This he may clearly do since the usage of a "Ph.D." title has not been regulated.[9] *See In re R.M.J.,* 455 U.S. 191, 102 S.Ct. 929, 71 L.Ed.2d 64 (1982).

## B. DUE PROCESS AND EQUAL PROTECTION

The Fourteenth Amendment guarantees that no person shall be deprived of "life, liberty, or property without due process of law" and guarantees that no person shall be denied "the equal protection of the laws." The Supreme Court has held that the right to hold specific private employment and to follow a chosen profession free from unreasonable governmental interference comes within the "liberty and property" concepts of this constitutional amendment, "property" meaning the employment, and "liberty" being the freedom to practice a chosen profession. *Dent v. West Virginia,* 129 U.S. 114, 9 S.Ct. 231, 32 L.Ed. 623 (1889); *United States v. Robel,* 389 U.S. 258, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967); *Greene v. McElroy,* 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959); *Schware v. Board of Bar Examiners,* 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796 (1957); *Peters v. Hobby,* 349 U.S. 331, 352, 75 S.Ct. 790, 801, 99 L.Ed. 1129 (1955), concurring opinion; *cf. Slochower v. Board of Education,* 350 U.S. 551, 76 S.Ct. 637, 100 L.Ed. 692 (1956); *Truax v. Raich,* 239 U.S. 33, 41, 36 S.Ct. 7, 10, 60 L.Ed. 131 (1915); *Allgeyer v. Louisiana,* 165 U.S. 578, 589–590, 17 S.Ct. 427, 431–32, 41 L.Ed. 832 (1897); *Powell v. Pennsylvania,* 127 U.S.

678, 684, 8 S.Ct. 992, 995, 32 L.Ed. 253 (1888).

It is beyond dispute that a state has broad power to establish and enforce standards of conduct for the purpose of protecting the health of everyone within its boundaries. It is a vital part of its police power. Moreover, a state's discretion in that field extends naturally to the regulation of all professions concerned with health. *Barsky v. Board of Regents,* 347 U.S. 442, 449, 74 S.Ct. 650, 654, 98 L.Ed. 829 (1954); *Williamson v. Lee Optical Co.,* 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955); *See also, Eisenstadt v. Baird,* 405 U.S. 438, 465–472, 92 S.Ct. 1029, 1044–47, 31 L.Ed.2d 349 (1972) (Burger, C.J. dissenting). Despite this police power an individual retains their due process rights. However, the "Due Process Clause imposes only broad limits on the exercise by a State of its authority to regulate its economic life, and particularly the conduct of the professions." *Thompson v. Schmidt,* 601 F.2d 305, 308–309 (7th Cir.1979) (and cases cited therein) (challenge of the grading methods and procedures for the real estate broker's examination in Indiana).

## 1.
## DUE PROCESS CLAIMS

The essence of a due process violation is the deprivation of a protected "liberty" or "property" interest without adequate procedural safeguards. *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972); *Johnson v. Brelje,* 482 F.Supp. 125 (N.D.Ill.1979). Due process considerations are flexible however and require only such procedural protection as the particular situation demands.

---

**8.** The Court has no contrary evidence regarding the issuance of a Ph.D. degree from Clayton University to the plaintiff.

**9.** When courts have examined attempts to protect rights pursuant to the First Amendment to advertise a "M.D." degree, having received a "D.O." degree, the claims have been rejected. See, *Maceluch v. Wysong,* 680 F.2d 1062 (5th Cir.1982); *Oliver v. Morton,* 361 F.Supp. 1262 (N.D.Ga.1973). Plaintiff's usage of his Ph.D. in

advertising has been absent any further explanatory information. *See Friedman v. Rogers,* 440 U.S. at 24–25, 99 S.Ct. at 901–02 (JJ. Blackman and Marshall, concurring and dissenting in part.) Clarifying information, absent some other regulatory justification or additional regulatory guidelines, may present an additional First Amendment issue. However, such a case must be reserved for another day.

*Ringquist v. Hampton,* 582 F.2d 1138 (7th Cir.1978), *cert. denied,* 440 U.S. 910, 99 S.Ct. 1220, 59 L.Ed.2d 458 (1978). The touchstones of procedural due process are fairness and reasonableness. The appropriate procedural requirements are dictated by the nature of the interest, not the nature of the harm flowing from the deprivation of that interest. Therefore, the Court must inquire into the nature of the governmental function involved in the dispute as well as the plaintiff's private interest that has been affected. *Morrissey,* 408 U.S. at 481–482, 92 S.Ct. at 2600–01.

■ Due Process claims are assessed under a two-step analysis. The Court must initially determine whether plaintiff's interests rise to a level of constitutionally protected "liberty" or "property" interests. If the plaintiff makes this showing, the Court must go on to analyze what procedures are required under the facts of the case and whether the defendant has violated such procedures. *Gaballah v. Johnson,* 629 F.2d 1191 (7th Cir.1980); *U.S. ex rel. Hoss v. Cuyler,* 452 F.Supp. 256 (D.C.Pa.1978).

The Court does find that certain protected "liberty" and "property" interests have been sufficiently infringed to require some form of hearing prior to a determination being made by the Board regarding the continued use of a licensed professional's degree or title. Considerable latitude must be accorded the plaintiff in this case where neither the statutory nor regulatory provisions clearly define a licensed psychologist's duty to notify the Board of any academic degree change.

**10.** Under I.C. 25–33–1–10 the Board is required to renew every two (2) years the licenses of persons who pay a renewal fee.

"Each psychologist certified under the provisions of this act (25–33–1–1—25–33–1–17) shall pay to the board every two (2) years following the year of his initial certification, during such month of the year as the board shall designate, a renewal fee in the amount to be established under the provisions of section 3(a) (subdivision (a) of 25–33–1–3) of this act. The board shall, upon receipt of said fee, issue to the psychologist a certificate renewing his certification for a term of two (2) years. The certificate of any psychologist who shall fail to renew his certification in this manner shall lapse. Such lapsed certificate may be renewed

**a. LIBERTY AND PROPERTY**

John Buxton has continued to be free to practice his chosen profession—psychology—since the entry of the Agreed Judgment on November 8, 1979. *See generally,* Annot. 47 L.Ed.2d 975 (1977). The only time period that Mr. Buxton's Private Practice Certificate was in question was from the expiration date of his previous Private Practice Certificate on October 26, 1979 through the date of the Agreed Entry on November 8, 1979. (Plaintiff's Exhibit # 21). Dr. George D. Lovell, Chairman of the Psychology Board, attempted to withhold statutory re-certification, as outlined in I.C. 25–33–1–10,[10] in order to obtain Mr. Buxton's compliance with the Board's previous notifications regarding plaintiff's use of various titles in connection with his practice. (Plaintiff's Exhibit # 13). The plaintiff waived his right to recover money damages or attorney fees for the loss of business during this approximately two (2) week period in return for defendant's being permanently enjoined from denying plaintiff renewal of his Private Practice Certificate due to use of various designated titles. (Agreed Judgment, November 8, 1979). Since Mr. Buxton's license to practice his chosen profession has not been significantly infringed, the Court must determine whether plaintiff's interests have been infringed in some other fashion.[11]

The plaintiff attempts to demonstrate deprivation of his "liberty" interests through the "stigma," as defined in *Board*

within a period of eighteen (18) months after such lapse, upon payment of said renewal fee, or, thereafter, upon payment of a fee in the amount required for issuance of the original certificate. (Acts 1969, ch. 416 § 10, p. 1771).

**11.** The issues in this case may have been dramatically altered had the Board persisted in withholding plaintiff's license to privately practice psychology without notice or a hearing. See I.C. 25–33–1–13 as amended, I.C. 25–33–1–13.1; *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); *Pollock v. Methodist Hospital,* 392 F.Supp. 393 (E.D.La.1975); *Friendship Medical Center, Ltd. v. Chicago Board of Health,* 367 F.Supp. 594 (N.D.Ill.1973).

*of Regents v. Roth,* 408 U.S. 564, 573, 92 S.Ct. 2701, 2707, 33 L.Ed.2d 548 (1972), of losing his Ph.D. privileges. Mr. Buxton claims that his reputation and standing in the community have been damaged by the actions of the Board to the extent that the plaintiff has lost employment. The plaintiff demonstrated an effect on his employment. (See Plaintiff's Exhibit # 14 and # 15).

The defendants rely upon *Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976) for the proposition that any harm or injury to a person's reputation does not result in a deprivation of any "liberty" or "property" interest. Without injury to either interest one may not invoke the procedural protections of the Due Process Clause. Injury to reputation alone does not constitute sufficient harm to an individual's constitutional interests to invoke constitutional protection. 424 U.S. at 701. Thus, Mr. Davis found that his name and picture being included on a "flyer" characterizing him as an "active shoplifter" did not implicate constitutional interests sufficient to invoke procedural protections since his reputation was all that had been damaged. However, the Supreme Court carefully explained that damage to reputation, in conjunction with more tangible interests such as employment, could invoke constitutional protections. 424 U.S. at 701–711.

The Seventh Circuit Court of Appeals has termed and addressed the "stigma plus" test of *Roth, supra; Paul, supra* in *Margoles v. Tormey,* 643 F.2d 1292 (7th Cir.1981), *cert. denied,* 452 U.S. 939, 101 S.Ct. 3082, 69 L.Ed.2d 954 (1982); *Elbert v. Board of Ed.,* 630 F.2d 509 (7th Cir.1980); *cert. denied,* 450 U.S. 1031, 101 S.Ct. 1741, 68 L.Ed.2d 226 (1981); *Colaizzi v. Walker,* 542 F.2d 969 (7th Cir.1976) *cert. denied,* 430 U.S. 960, 97 S.Ct. 1610, 51 L.Ed.2d 811 (1977). This line of cases establishes that in order to demonstrate the infringement of a "liberty" or "property" interest sufficient to implicate Fourteenth Amendment safeguards, the plaintiff must not only be stigmatized, but the stigma must be made in conjunction with the denial of a right or status previously recognized under state law. *EEOC v. Sears, Roebuck & Co.,* 504 F.Supp. 241 (N.D.Ill.1980). The Board through their actions stigmatized the plaintiff, which affected his psychology practice, through removing the right to utilize the Ph.D. degree. This removal took place without a hearing and without any knowledge by the Board of where the degree was from. The degree may have been from the most prestigious and recognized institution in the nation when the Board made its decision. Thus the Board attempted to effectively remove Mr. Buxton from ever utilizing a Ph.D. degree, without proceeding through the state licensing process, when plaintiff already held the license. The Board's removal of the plaintiff's Ph.D. status became known to the professional and public community. Since "property" and "liberty" interests are inherent in an academic degree and since the Board's actions denying plaintiff the temporary use of his license and the use of his academic degree resulted in an employment loss due to the stigma attached to that action, *Margoles, supra; Colaizzi, supra; Poirier v. Hodges,* 445 F.Supp. 838, 842–3 (M.D.Fla.1978), the plaintiff is entitled to notice of the requirements that he must fulfill and of a hearing when action is taken against him.

The Board never challenged the plaintiff's Ph.D. degree as awarded by Clayton University. The Board never sought documentation of the academic degree, they simply summarily denied plaintiff the use of his Ph.D. degree since he originally qualified to practice psychology with his Master's Degree.[12] An individual

---

12. The Board policy of treating a practicing professional who obtains a subsequent degree in the same manner as a licensing applicant, who must apply, submit educational credentials as well as be examined and submit the requisite fee, is an antithesis to the purpose behind a "grandfather" provision. If "grandfathered" professionals are competent to practice, certainly they should be encouraged to seek additional education. Clearly, the Board, the public and the State have an interest and the authority in seeing that the additional de-

has a "property" interest in his/her academic degree. *National Mutual Insurance Co. v. Tidewater Transfer Co.,* 337 U.S. 582, 646, 69 S.Ct. 1173, 1195, 93 L.Ed. 1556 (1949) (Frankfurter, J. dissenting); *Arnett v. Kennedy,* 416 U.S. 134, 207–208 and n. 2, 94 S.Ct. 1633, 1670–71 and n. 2, 40 L.Ed.2d 15 (1974) (Marshall, J., dissenting); *Board of Regents v. Roth,* 408 U.S. at 571–572, 576–577, 92 S.Ct. at 2705–06, 2708–09. *See, e.g. Barry v. Barchi,* 443 U.S. 55, 99 S.Ct. 2642, 61 L.Ed.2d 365 (1979) (horse trainer's license protected); *Memphis Light, Gas & Water Div. v. Craft,* 436 U.S. 1, 11–12, 98 S.Ct. 1554, 1561, 56 L.Ed.2d 30 (1978) (utility service); *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) (disability benefits); *Goss v. Lopez,* 419 U.S. 565, 573–574, 95 S.Ct. 729, 735–36, 42 L.Ed.2d 725 (1975) (high school education); *Connell v. Higginbotham,* 403 U.S. 207, 91 S.Ct. 1772, 29 L.Ed.2d 418 (1971) (government employment); *Bell v. Burson,* 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971) (driver's license); *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) (welfare benefits). That interest cannot be dismissed or handled lightly. In this case, plaintiff subsequently earned a higher academic degree after practicing successfully for many years. This professional is not in the same position as someone who has earned the same degree, but is seeking licensure from the Board. The two situations are distinguishable since the academic degree is not a prerequisite for licensure for this plaintiff. To deny the plaintiff the use in his newly acquired academic degree, when he is a successful practicing and licensed psychological professional, requires

minimum procedural due process. If the Board or the State has an interest in regulating licensed professionals who subsequently earn additional titles or degrees, the requirements for such regulations must be clear. At present, the Court concurs with the plaintiff that he was not adequately informed by the statutes or regulations of any duty to inform the Board of his new degree.

 The Board took a contrary position citing I.C. § 25–33–1–12(a) and 868 IAC 1–4–1. This statute and regulation are inadequate to inform a practicing professional of a duty to report or of a duty in the use of a subsequent academic degree. Indiana Code § 25–33–1–12(a) [13] defines minimal guidelines for psychologists in the services they may render. Certainly, determination of a professional's conduct pursuant to this statute requires due process. The Court agrees with the Board that they are empowered to determine when a psychologist may have acted outside his/her area of competence, within the Board's regulations and the statutory mandates. However, I.C. § 25–33–1–12(a) has nothing to do with the reporting of or the possession of, an academic degree. The possession of an academic degree does not in and of itself define the services a professional may render when that professional is fully licensed to practice psychology. The plaintiff's practice of psychology was in good standing and the mere additional use of an academic degree, absent clarifying regulation, does not alter this fact.

The regulation found at 868 IAC 1–4–1 [14] does nothing more than define a doctoral

grees or titles derived from that education meet minimal standards. However, treatment of these individuals in the same manner as licensing applicants is inappropriate. *See Berger v. Board of Psychologist Examiners,* 521 F.2d 1056 (D.C.Cir.1975).

**13.** 25–33–1–12 [63–3612]. *Services outside scope of training and experience prohibited— Assisting clients in obtaining services of other professions.*—(a) A psychologist shall not offer to render, or render services which are beyond the scope of his competence, as determined by his training and experience. The psychologist

who engages in private practice as defined in this act [25–33–1–1—25–33–1–17] shall assist his client in obtaining professional help for all relevant aspects of the client's problem that fall outside the boundaries of the psychologist's own competence.

**14.** 868 IAC 1–4–1 *Doctoral degree in psychology; what constitutes*
Sec. 1. The doctoral degree in psychology shall mean a doctoral degree offered by a department of psychology in an institution accredited by a regional accrediting association to offer the Doctor of Philosophy degree. (*State*

degree in psychology. This definition must be read in conjunction with the statute or statutes it is intended to define. The regulation does not define a duty to report a subsequent academic degree and cannot be extrapolated to permit the Board to deny plaintiff's use of his Ph.D. degree without a hearing. Such a definition could be utilized in defining the minimal requirements for the doctoral degree earned by practicing professionals who desired to advertise the academic degree in conjunction with their psychology practice; although that was not and is not the case at present.[15]

The Board offered the Ethical Standards and the Ethical Principles of the American Psychological Association (APA) to establish a duty on the part of the plaintiff to report his academic degree to the Board. The plaintiff admitted, and the regulations require, that practicing psychologists conform their conduct to the APA standards. *See* 868 IAC 1–11–1 and 868 IAC 1.1–11–1. The Ethical Standards provide minimal guidelines for the conduct of psychologists. The Ethical Principles provide goals to which a psychologist ought to strive to conform his/her conduct. The practicing psychologist has a duty to conform his/her conduct to the minimal standards (868 IAC 1–11–1 and 868 IAC 1.1–11–1). Failure to so conform may result in disciplinary Board action. Professional conduct is subject to

investigation. Any hearing determination requires due process as explicitly defined in I.C. § 25–33–1–13, as amended I.C. § 25–33–1–13.1. The Court cannot find where the Ethical Standards or Principles of the APA establish a specific duty to report an academic degree to the Board.

In order to justify the Board's summary action, the Board cited the Ethical Principles of the APA for the proposition that the plaintiff is required to receive his degree from an accredited institution.[16] The 1977 version of the Ethical Principles was in effect when plaintiff received his degree. The plaintiff stated Principle 4(a) permitted announcement of one's "highest relevant degree conferred." Mr. Buxton so advertised in 1979. The Board cited Principle 4(a) of the Ethical Principles of Psychologists (1981) which established a higher goal for psychologists' advertising. This Principle permitted announcement of the highest relevant degree, but added that it be "earned from a regionally accredited institution." This 1981 Principle is not applicable to plaintiff's conduct in 1979. Given any analysis, Ethical Principles do not define the minimum conduct required of a psychologist since the Board has only adopted the Ethical Standards as minimum guidelines. 868 IAC 1–11–1 and 868 IAC 1.1–11–1. Given the factual information supplied to the Court and the Ethical Stan-

---

*Board of Examiners in Psychology:* Rule 4.1; filed Dec. 4, 1970, 11:35 a.m.: Rules and Regs. 1971, p. 95).

**15.** The Board also relied upon 868 IAC 1.1–5–8 which provides:

868 IAC 1.1–5–8 *Change in type of certificate on basis of certification*

Sec. 8. An applicant who possesses a valid certificate may seek a re-issuance of the same type of certificate on one or more different bases, or may seek a different type of certificate. If the effort to change the basis of certification or to change the type of certificate is not successful, the originally possessed valid certificate shall continue to be valid. (*State Board of Examiners in Psychology:* Rule 6.8; filed Jul. 13, 1979, 9:07 a.m.: 2 IR 1135)

Aside from the fact this regulation was promulgated after the Board initially requested the plaintiff to cease use of his academic degree, it fails to define any duty to report a subsequent

academic degree a psychologist may obtain after having been issued a Private Practice Certificate. This Court will not require such a duty based upon the vague and unclear intent behind the language, "re-issuance of the same type of certificate on one or more different bases." Certification rests upon meeting statutory requirements. How the professional meets these licensure requirements is separate and distinct from the obtaining and use of a doctoral degree subsequent to receipt of license certification.

**16.** Principle 2(a) of the Ethical Standards of Psychologists (1977) stated that:

(a) Psychologists accurately represent their competence, education, training and experience. Psychologists claim as evidence of professional qualifications only those degrees obtained from institutions acceptable under the Bylaws and Rules of Council of the American Psychological Association.

dards cited, no duty arises to report a subsequent academic degree to the Board. The Court will not and cannot dismiss a practicing psychologist's right to notice and a hearing prior to any action being taken regarding the violation of an Ethical Standard or Principle regarding the use of advertising one's highest relevant academic degree. Plaintiff's conduct has not deviated from the minimum professional standards required of him.

### b. HEARING

██ Having found that Mr. Buxton has asserted protected interests that are entitled to due process procedural safeguards, the Court must balance the interests of the state in regulating psychologists through the Board, against those of the individual, to determine the form of hearing Mr. Buxton is entitled to. What "due process" requires in terms of time and format of an administrative hearing depends largely upon the urgency and weight of the governmental interest as compared to that of the personal property rights being infringed. *Goldberg v. Kelly,* 397 U.S. 254, 262–263, 90 S.Ct. 1011, 1017–18, 25 L.Ed.2d 287 (1970).

██ The Board has an important interest in assuring the integrity of the use of relevant titles and academic degrees in the practice of psychology. The magnitude of a licensed and practicing psychologist's interest in avoiding the temporary interruption of one's license to practice and the suspension of one's use of the highest relevant academic degree is substantial. The interruption to the psychologist's employment, and the disruption and confusion surrounding the psychologist's reputation and fitness to practice, create substantial turmoil in the quality and continuity of the service to the clients. Similar confusion exists with respect to the professionals who refer to or work with the psychologist. In the normal course of events, pre-suspension notice and an opportunity for hearing are required.[17]

In fact, the Court does not consider the determination of the use of a relevant title or academic degree to be dissimilar from a disciplinary investigation and hearing. (I.C. § 25–33–1–13, as amended I.C. § 25–33–1–13.1) The Indiana State Legislature has recently defined the powers and established the procedures for the Board. The amended I.C. § 25–33–1–3(c)(4) (1979) states:

> (c) The board is empowered to:
>
> (4) Subject to I.C. § 25–1–7 [25–1–7–1—25–1–7–11], investigate and conduct hearings, upon complaint against individuals certified or not certified under this chapter, concerning alleged violation of any provision of this chapter. Such procedure shall be conducted in accordance with the provisions of I.C. § 4–22–1 [4–22–1–1—4–22–1–30]. Approval by a majority of all members of the board shall be required for any action to be taken;

Had similar procedures been followed earlier, this matter may not have been before the Court today.

The administrative procedures delineated in I.C. § 4–22–1–1, *et seq.,* are sufficient to guide the Board in conducting a hearing. The "liberty" and "property" interests inherent in an academic degree or title require that the Board give notice and a hearing if they intend to alter a licensed psychologist's use of those interests.

### 2.

### EQUAL PROTECTION

The plaintiff also asserts that if the Board is permitted to exercise authority in the manner it has attempted, plaintiff's equal protection rights will be violated. The Court must examine whether the legislative treatment of Mr. Buxton through the statutes governing his private practice of psychology is reasonably related to a public purpose as it relates to the use of his new academic degree.

---

**17.** This assumes no immediate danger to public health and safety since "it is well-recognized that drastic administrative action is often essential to eliminate public health threats which should not be allowed to exist prior to completion of formal proceedings. *See* K. Davis, Administrative Law Treatise § 708 at 438" *Friendship Medical Center, Ltd. v. Chicago Board of Health,* 367 F.Supp. 594, 604 (N.D.Ill.1973). *See Barry v. Barchi,* 443 U.S. 55, 99 S.Ct. 2642, 61 L.Ed.2d 365 (1979) (propriety of post suspension hearing in horse racing).

■ It is helpful to state at the outset the general principles which are applicable under equal protection. If the legislative difference in statutory treatment is reasonably related to a public purpose, it is permissible. *Watson v. Maryland,* 218 U.S. 173, 178, 30 S.Ct. 644, 646–47, 54 L.Ed. 987 (1910); *McGowan v. Maryland,* 366 U.S. 420, 425–426, 81 S.Ct. 1101, 1104–05, 6 L.Ed.2d 393 (1961); *McDonald v. Board of Election Commissioners,* 394 U.S. 802, 809, 89 S.Ct. 1404, 1408–09, 22 L.Ed. 739 (1969). The equal protection clause limits legislative discretion in delineating classifications only to the extent of forbidding "arbitrary or irrational" classifications or discrimination which is "invidious". *Williamson v. Lee Optical of Oklahoma, Inc.,* 348 U.S. 483, 489, 75 S.Ct. 461, 465, 99 L.Ed. 563 (1955). Therefore, the issue is whether the classification in the "grandfather" clause of I.C. § 25–33–1–8(b) bears a rational relationship to a proper legislative objective or creates a classification which is arbitrary or irrational. In this context, Mr. Buxton contends that the Board's asserted regulation of the use of his Ph.D. designation is not related to any reasonable and vital need or interest regulating health and thus is arbitrary.

■ A classification based upon tenure may have a legitimate governmental rationale and thus be constitutionally permissible.

The legislative classification enacted in I.C. § 25–33–1–8(b) permits a psychologist to be licensed and to continue his/her private practice of psychology despite not fully qualifying with more recent educational requirements.[18] This "grandfather" clause permitted practicing psychologists to maintain the *status quo* without being penalized for failure to anticipate the more rigorous educational requirements enacted by the State Legislature in 1969. It encompassed those individuals who had accumulated substantial tenure in the practice of psychology but did not fall within the more stringent 1969 requirements for licensure. This discrimination, based upon tenure, is proper. *See Berger v. Board of Psychologist Examiners,* 521 F.2d 1056 (D.C.Cir.1975).

■ The "grandfather" clause permits a professional to continue his license to practice psychology. This fact cannot be presumed to entitle an individual to any academic degree or the use of that degree. No evidence was presented to the Court that the Board is empowered to grant a Ph.D. degree—an authority vested in institutions of higher learning. Recognizing the tenure of a practicing professional for licensure purposes does not offend equal protection; however, it may not be extended to support the use of an academic degree unless the legislature so provides.[19]

18. There are four certificate levels: (1) probationary basis certificate—I.C. § 25–33–1–7, (2) basic certificate—I.C. § 25–33–1–5, (3) probationary private practice certificate—I.C. § 25–33–1–8, (4) private practice certificate—I.C. § 25–33–1–8. In particular, the provisions of a Private Practice Certificate pursuant to the "grandfather" clause in I.C. § 25–33–1–8(b) are as follows:

"Fulfills the qualifications stated in section 5(a), (b) and (d) (subsections (a)(b) and (d) of § 25–33–1–5) and holds a master's degree in psychology, or its equivalent, awarded by a recognized institution of higher learning and presents evidence to the board that he has had at least eight (8) years of professional experience obtained after his degree, which is, in the judgment of the board, in the practice of psychology, as defined by this chapter (25–33–1–1 —25–33–1–17): Provided, however, That such experience must be obtained within seven (7) years of the taking effect of this chapter: Provided, further, That the board shall not issue private practice certificates under the provi-

sions of this section of the chapter to any person who has not filed with the board a notice of intention to apply for such private practice certificate. Said notice of intention to apply must be filed upon forms provided by the board on or before July 1, 1972 and must be accompanied with a showing that said applicant is presently engaged in securing the professional experience required in this section. . . . "

19. Even though the plaintiff is already a licensed psychologist, that does not require the Board or the State to dispense with minimal standards for the use of an academic degree in conjunction with the professions. For instance, accreditation requirements have long been upheld when an individual must submit educational credentials for a professional license. *Santos v. Alaska Bar Association,* 618 F.2d 575 (9th Cir.1980). Accreditation requirements are appropriate for academic degrees, no matter when they are obtained, since academic standards can vary dramatically. What the

In Indiana, it is apparently the product of legislative and regulatory oversight that provisions were not made to deal with a successfully practicing psychologist, licensed with a Masters Degree, who subsequently earns a Ph.D. degree. Thus plaintiff's conduct at issue in this case has been appropriate. Why the plaintiff chose to attend classes at accredited institutions and finish his Ph.D. at an unaccredited institution was not explained. It is not important at this point since neither the Board nor the Legislature have chosen to regulate it.

The same due process and equal protection arguments that required "grandfather" licensing of qualified professionals based upon tenure, do not require unregulated use of academic degrees. Certainly, the State may choose to legislate or the Board may choose to regulate minimum standards of notice to the Board, relevancy and/or accreditation regarding the obtaining and use of additional academic degrees.

The fact that individuals are recognized as private practitioners, may have constitutional implications on the extent of requirements a practitioner must meet in utilizing an additional academic degree. In *Watson v. Maryland*, 218 U.S. 173, 30 S.Ct. 644, 54 L.Ed. 987 (1910), the Supreme Court upheld a Maryland statute exempting physicians who had practiced in the state for four (4) years from taking a licensing examination, upon the reasonable legislative "theory that those who have acceptably followed the profession in the community for a period of years may be assured to have the qualifications which others are required to manifest as a result of an examination", 218 U.S. at 177, 30 S.Ct. at 646, 54 L.Ed. at 989. *See also, Dent v. West Virginia*, 129 U.S. 114, 9 S.Ct. 231, 32 L.Ed. 623 (1889). It would follow that a private practitioner would not need to take any licensing examination upon receipt of an additional academic degree or title. Minimum standards to qualify for a degree or title, as determined by recognized and qualified institutions or regulating boards, may be sufficient.

Even though the plaintiff is already a practicing psychologist, that does not require the Board or the State, if it chooses to do so, to dispense with an accreditation or relevancy requirement for any subsequent degree a practicing professional may desire to use.[20] In this case the Court has not been presented with statutes or regulations which require plaintiff to meet an accreditation requirement for his subsequent Ph.D. degree.

individual obtains from an academic education cannot be obtained through a day-to-day practice, thus accreditation requirements for academic degrees are logically useful at all times.

20. The Board did establish that it has an interest in protecting the integrity of the titles a practicing professional attributes to him or herself. The Board derives its authority for this interest through the declared policy of the statutory scheme, I.C. § 25–33–1–1. As the Board members explained, a new title or degree when used in conjunction with one's psychology practice, gives the citizens of the State an impression regarding the qualifications of the person holding him/herself out in such a manner. This is true despite the degree or where it is from. To permit an individual to hold him/herself out as one who qualified for a certificate (albeit the same certificate) or an academic degree in a manner different from what is ordinarily required, results in misleading the profession and the public. It circumvents the spirit (the Board also argued, the letter) of the statutory scheme through the appearance of qualifying (1) for certification on a basis different than which the plaintiff did or (2) for an academic degree on a basis different than what is expected of the profession. In other words, it circumvents the legislative intent for qualification to practice psychology through the appearance of having qualified for certification or for an academic degree in a manner plaintiff did not. Thus, on a biennial basis the plaintiff would be recertified (I.C. § 25–33–1–10 to his Private Practice Certification upon his qualifications pursuant to the "grandfather" clause (I.C. § 25–33–1–8(b)), yet the plaintiff would hold himself out in the manner as a psychologist who qualified to practice with a Ph.D. (I.C. § 25–33–1–8(a)). Also, the public would assume the individual received his Ph.D. degree from an accredited institution. The Court agrees that the Board and the public have an interest in maintaining the integrity and the minimal qualifications for titles associated with the practice of psychology. However, if the Board intends to regulate the use of academic degrees subsequently earned by practitioners, it must explicitly do so.

█ On equal protection grounds, the Court was not presented with any evidence that other psychologists have been permitted to advertise a Ph.D. degree or other title when they were not approved by the Board. Likewise, no evidence was presented that foreign psychology school graduates have been permitted to advertise Ph.D. degrees when in fact, they were awarded some other professional academic degree. *See Eatough v. Albano,* 673 F.2d 671 (3rd Cir.1982), *cert. denied* —— U.S. ——, 102 S.Ct. 2931, 73 L.Ed.2d 1331 (1982); *Maceluch v. Wysong,* 680 F.2d 1062 (5th Cir. 1982). Assuming the Board had clearly regulated the area in issue, Mr. Buxton did not establish his claim for denial of equal protection benefits since no arbitrary or irrational classifications were sufficiently presented.

## IV

### CONCLUSIONS

Based upon the foregoing, the Court does not find sufficient definition in the statutory and regulatory schemes governing psychologists to affirm the actions of the Board as they relate to the use of and report of a Ph.D. degree earned by a Private Practice Certificate holder. Despite the Board having the statutory authority to regulate the practice at issue in this case, legislative and Board oversight have left the area unregulated. Without appropriate regulations, the Board's actions were not proper.

The procedures followed by the Board in this matter were constitutionally inadequate. Due Process must be accorded an individual whenever the Board takes actions involving the use of an academic degree by a properly licensed psychologist.

The Board, through its motion to determine this issue, has indicated its desire to remove plaintiff's right to utilize his Ph.D. degree. To do so without a proper hearing, under any circumstances, would violate an individual's constitutional Due Process rights. The plaintiff has demonstrated the irreparable harm he suffers from such a constitutional deprivation without an adequate remedy at law, and thus he is entitled to have the Board enjoined from taking action against him for the use of his Ph.D. degree under the statutory and regulatory schemes as they presently exist.

Therefore, it is ORDERED, ADJUDGED and DECREED by the Court, that the defendants shall be permanently enjoined from taking action against the plaintiff, John A. Buxton, for the use of his Ph.D. degree in connection with his practice under the statutory and regulatory schemes as they existed at the times relevant to this lawsuit which were established to govern psychologists.

It is further ORDERED, ADJUDGED and DECREED that the Court reaffirms the definitive terms set forth in the Agreed Judgment Entry dated November 8, 1979.

It is further ORDERED, ADJUDGED and DECREED that the plaintiff waived his right to recover a money damage judgment for loss of business, against the defendants, individually, as governed by the Agreed Judgment Entry.

It is further ORDERED, ADJUDGED and DECREED that the plaintiff is entitled to recover from the defendants, his attorney fees incurred in the prosecution of this action from the date of, and as governed by, the Agreed Judgment Entry. The costs of this action are charged against the defendants.